UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
:
ILARIA BULGARI,
               Plaintiff,                  :
:
        - against -          :
:
VERONICA BULGARI, in her capacity as  :
Trustee of the Anna Bulgari Family Trust #1  :
and Trustee of the Anna Bulgari Family    :       22-CV-5072 (LGS) (RWL)
Trust #2,                         :
                Defendant/        :
                Counterclaim-Plaintiff,  :    **REPORT AND RECOMMENDATION**
:    **TO HON. LORNA G. SCHOFIELD:**
       -against -         :   **MOTION FOR SUMMARY JUDGMENT**
:
ILARIA BULGARI,             :
                Plaintiff/Counterclaim-  :
                Defendant,       :
:
       -and-           :
:
JAN BOYER,               :
                Counterclaim/Defendant.  :
-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Ilaria Bulgari ("Ilaria"), Defendant Veronica Bulgari ("Veronica"), and non-party Natalia Bulgari ("Natalia") are each the beneficiaries of two trusts established by their father Nicola Bulgari ("Nicola"). Although the trust assets greatly increased in value to more than a $100 million, Ilaria claims that Veronica breached her fiduciary duties as trustee. Ilaria accuses Veronica of being unable to account for at least $1.28 million in trust assets, failing to properly maintain records and promptly furnish them upon request, failing to investigate purported irregularities, and placing Veronica's interests above those

1

of Ilaria in violation of the duty of loyalty. Veronica already has filed a formal accounting of the trusts, which remains pending in state Surrogate's Court.

Veronica now moves for summary judgment. She points to considerable evidence indicating that she diligently and faithfully carried out her fiduciary duties and did so for the equal benefit of each sister. Nonetheless, Ilaria has raised some genuinely disputed issues of material fact that preclude dismissing all of her claims. Accordingly, for the reasons explained below, Veronica's motion for summary judgment should be GRANTED IN PART and DENIED IN PART.

## Factual Background[1]

### A.    The Parties and The Trusts

Veronica, Ilaria, and Natalia are the daughters of Anna Bulgari ("Anna") and Nicola Bulgari ("Nicola"). Veronica is the eldest sister. On June 1, 2005, in connection with

---

[1] The facts are drawn from: Plaintiff Ilaria Bulgari's Response To Defendant Veronica Bulgari's Statement Of Undisputed Material Facts at Dkt. 370 ("Ilaria 56.1 Resp."); Defendant Veronica Bulgari's Response To Plaintiff Ilaria Bulgari's Statement Of Additional Material Facts Pursuant To Local Rule 56.1 at Dkt. 396 ("Veronica 56.1 Resp.); the Declaration Of Veronica Bulgari at Dkt. 347 ("Veronica Decl."); the Declaration of Stephan Haimo at Dkt. 345 ("Haimo Decl."); the Declaration of Robert Dumont at Dkt. 344 ("Dumont Decl."); the Declaration of Gary Gartner at Dkt. 324 ("Gartner Decl."); the Declaration of Ilaria Bulgari at Dkt. 365 ("Ilaria Decl."); the Declaration of Jan Edward Boyer at Dkt. 367 ("Boyer Decl."); the Declaration of Mitchell A. Karlan at Dkt. 349 ("Karlan Decl."); the Declaration of David Boies at Dkt. 368 ("Boies Decl."); and the Reply Declaration of Mitchell A. Karlan at Dkt. 392 ("Reply Karlan Decl."), and all exhibits thereto. Four other declarations – those of Natalia Bulgari at Dkt. 346 ("Natalia Decl."); Nicola Bulgari at Dkt. 327 ("Nicola Decl."), Rochelle B. Zarett at Dkt. 348 ("Zarett Decl."), and Elizabeth M. Kay at Dkt. 366 ("Kay Decl.") – are the subject of motions to strike discussed below. The parties' summary judgment briefs include Defendant Veronica Bulgari's Memorandum Of Law In Support Of Her Motion For Summary Judgment at Dkt. 356 ("Veronica Mem."), Plaintiff Ilaria Bulgari's Memorandum Of Law In Opposition at Dkt. 360 ("Ilaria Mem."), and Defendant Veronica Bulgari's Reply Memorandum Of Law In Further Support at Dkt. 390 ("Veronica Reply"). Unless otherwise indicated, the facts are undisputed.

Both parties have asserted disputed and undisputed facts that are not material to

2

Anna and Nicola's divorce, Nicola established an irrevocable trust for Anna's benefit, the Anna Bulgari Family Trust #1 ("Trust #1). Trust #1 was initially funded on June 16, 2005, with a cash deposit of approximately $23 million in an account at Lehman Brothers. (Ilaria 56.1 Resp. ¶¶ 1-3.[2])

On October 6, 2005, Nicola established a second irrevocable trust for Anna, the Anna Bulgari Family Trust #2 ("Trust #2," and together with Trust #1, the "Family Trusts"). Trust #2 was funded with Nicola's one-hundred percent interest in Verda Company N.V. ("Verda N.V."), which was succeeded by Verda (U.S.) Corporation ("Verda U.S."). Verda N.V. owned the real property 43-94 Home Free in Millbrook, New York ("43-94 Home Free"), which it acquired in 1989. Anna used 43-94 Home Free as a secondary residence outside of New York City. (*Id.* ¶¶ 4-7.)

**B.    The Trust Agreements**

The Family Trusts' governing agreements (the "Trust Agreements") named Anna as the sole trustee and primary beneficiary of the Family Trusts. The Trust Agreements left the management and control of the Family Trusts, including use of their assets, entirely to Anna's discretion during her lifetime. (*Id.* ¶¶ 9-10.)

Article 3 of the Trust Agreements provides that if Anna has not made any provision for disposition of the Family Trusts' assets in her will, then the principal and accrued and undistributed income shall be allocated equally among Anna's then living issue – i.e., the

---

the instant motion. While the Court addresses some of those (principally in footnotes), the Court finds no need to address all of them (examples include Ilaria's relationship with her boyfriend, and an altercation between Ilaria and Veronica's husband).

[2] Where a citation follows a fact that is preceded by facts that do not include a citation, the citation applies to all such preceding facts.

three sisters – and held in a separate trust for each such person (the "Article 3 Successor Trusts"). The Article 3 Successor Trusts would each have two trustees: the sister who was the primary beneficiary of that particular trust and another person to be approved by the beneficiary's other living sisters. (*Id.* ¶¶ 11-12.)

The Trust Agreements do not specify the method by which the Trusts' real property assets are to be distributed. Rather, the Trust Agreements explicitly grant the trustee the power "to make such payment, division, or distribution in kind or in money, or partly in kind and partly in money." The Trust Agreements also explicitly grant the trustee the power "to consolidate and hold as a single trust for convenience of investment and administration" the Trusts' property. Additionally, the Trust Agreements grant the trustee certain "powers, authorities, and discretions," including "to give any investment advisor discretionary trading authority without liability for investment losses resulting from the investment decisions made by such advisor." (*Id.* ¶¶ 13-16.)

The Trust Agreements also include terms protecting the trustee from liability. The trustee is presumed to have acted reasonably, and no trustee shall be liable for a loss to the Family Trusts unless it is affirmatively shown that the trustee "failed to exercise reasonable care, diligence, prudence, judgment and good faith"; the trustee is not liable for any loss or damage caused by the opinion, recommendation, act, or omission of "any investment advisor, custodian, broker, agent, accountant or attorney employed by the Trustee in good faith"; and the trustee is not liable for "any loss or depreciation which may arise from any investment retained or made in accordance with [the Trust Agreement] or the provisions of the law or which may be occasioned by the exercise of any discretionary power authorized [by the Trust Agreement]." (*Id.* ¶ 17.)

4

**C.        Administration Of The Family Trusts Prior To Anna's Death**

While she was Trustee, Anna either invested, or caused others to invest, the Family Trusts' monetary assets with well-known financial institutions, including Morgan Stanley, Lehman Brothers, Barclays, and Neuberger Berman. (*Id.* ¶ 24.) Early in the Family Trusts' existence, Anna withdrew funds from the Trust #1 account at Lehman Brothers to fund various investments. (*Id.* ¶¶ 26-27.) Lehman Brothers account statements reflect that at the end of 2005, the Trust #1 account had a closing balance of $1,280,593.37. (*Id.* ¶ 28.) Veronica believes that the closing balance was either transferred to Morgan Stanley, faced market losses, was used to purchase securities, or was used to pay taxes. While there is no proof that the closing balance at Lehman Brothers was not accounted for by one of those four possibilities, there is no evidence to confirm exactly what happened to the funds other than the parties' speculation. (*See id.* ¶ 29.)

At times, Anna received assistance as Trustee from Veronica and her husband, Stephan Haimo ("Haimo"), a lawyer who provided legal advice to Anna. (Haimo Decl. ¶¶ 1, 9). For instance, in May 2005, Veronica was present with Anna for discussions with Lehman Brothers about the trust and potential investment strategies. (Boies Decl. Ex. GGGG.) Starting in or around 2008, at Anna's request, Veronica and Haimo sat in on meetings with Morgan Stanley about Trust #1's investments two or three times a year. (Haimo Decl. ¶ 10; Ilaria 56.1 Resp. ¶¶ 19-21.) Following the collapse of Lehman Brothers in September 2008, also at Anna's request, Haimo helped facilitate transfer of Trust #1's remaining assets under management at Lehman Brothers, and later those at Neuberger Berman, to Morgan Stanley and Barclays. (Haimo Decl. ¶¶ 10-14; *see also*

5

Ilaria 56.1 Resp. ¶¶ 24-25; Veronica 56.1 Resp. ¶¶ 124-25.)  Anna executed a general power of attorney authorizing Haimo to accomplish those transactions.[3]  (Veronica 56.1 Resp. ¶ 122; Boies Decl. Ex. J.)

In 2011, Anna caused Trust #1 to purchase a small cottage in Millbrook, New York adjacent to 43-94 Home Free (the "Cottage").  Following acquisition of the Cottage, funds from Trust #1, along with funds contributed by Anna personally, were used to renovate the Cottage.  The parties dispute the exact amount of Trust #1 funds used for that purpose.  (Ilaria 56.1 Response ¶¶ 32-33.)  Several years later, Anna caused Trust #1 to purchase a small parcel of land adjacent to 43-94 Home Free, thus adding a third piece of contiguous property to the Millbrook property holdings (collectively the "Millbrook properties").  (*Id.* ¶¶ 36-37.)

In or around May 2015, the liquid assets of Trust #1 were consolidated into accounts at Morgan Stanley.[4]  (*Id.* ¶¶ 35, 39.)  On May 28, 2015, Anna and Veronica signed a Morgan Stanley Trust Certification and Trust Agreement officially listing Veronica as a co-trustee of Trust #1.  (Veronica Decl. Ex. C.) As of May 31, 2015, Morgan Stanley account statements reflect Trust #1 liquid assets of more than $52 million.  (Ilaria 56.1 Resp. ¶ 40.)  Since then, as co-trustee, Veronica relied on and delegated management and investment of Trust #1's assets to Morgan Stanley and met with their investment advisors periodically to supervise their investment activities.  (Veronica Decl. ¶ 31.)

---

[3] Veronica was not aware that Haimo had the power of attorney with respect to Trust #1 until her deposition in 2023.  (Veronica 56.1 Resp. ¶ 123.)

[4] Ilaria contends that not all Trust #1 assets are accounted for.  That is not, however, inconsistent with the fact that the trust's assets, such as they were at the time, were consolidated with Morgan Stanley during 2015.

Additionally, Veronica has relied on advice of counsel, including Haimo, concerning trust-related matters.  (Ilaria 56.1 Resp. ¶ 42.)

**D.      Anna's Death And Formation Of The Sisters' Successor Trusts**

Anna died on October 22, 2019, and was survived by her three daughters.  (*Id*. ¶ 47.)  Upon Anna's passing, Veronica became sole trustee of the Family Trusts and was appointed executrix of Anna's estate.  (*Id*. ¶ 49.)  By that time, according to Morgan Stanley account statements, the value of Trust #1's assets had grown to more than $90 million.  (*Id*. ¶ 48.)  Anna's will did not contain any provision for disposition of the Family Trusts' assets (*Id*. ¶ 53); consequently, the assets were to be equally distributed to individual trusts for Veronica, Ilaria, and Natalia in accordance with the Trust Agreements.[5]

Veronica retained Robert Dumont ("Dumont") to represent her with respect to the Family Trusts.  Dumont is a tax attorney who previously served as a tax and financial advisor to Anna in connection with her divorce from Nicola.  (Dumont Decl. ¶¶ 1, 6, 11.)  Also around the time of Anna's death, Gary Gartner ("Gartner"), an attorney and personal advisor to Nicola (Gartner Decl. ¶ 3) and a friend of Veronica (Veronica 56.1 Resp. ¶ 144), began a dialogue with Dumont about Trust #1 and certain concerns purportedly raised by Nicola in regard to Ilaria.  (Dumont Decl. ¶ 12.)  On December 5, 2019, Dumont wrote to

---

[5] Ilaria asserts that upon Anna's death the trust assets should have been divided "immediately." (Veronica 56.1 Resp. ¶ 128.)  That is a legal conclusion; moreover, the Trust Agreements do not address the timing of division and distribution.  Rather, in provisions addressing termination of the trust upon Anna's death, the Trust Agreements simply direct that the assets "shall be allocated among" the beneficiaries per stirpes. (Boies Decl. Ex. C Art. 3(E).)  The legal issue about timing of distributions made by Veronica is discussed below.

Gartner to discuss "the question of successor trusteeship for two irrevocable estate tax proof trusts for the benefit of Ilaria." (Veronica 56.1 Resp. ¶ 133; *see also id.* ¶ 134 (stating that Dumont sent copies of the Family Trust documents to Gartner and expressed his looking forward to working together).) At a memorial service for Anna on January 30, 2020, Nicola expressed to Dumont his concerns about protecting Ilaria with respect to the trust to be funded with her share of the assets of Trust #1. (Dumont Decl. ¶ 13; Veronica 56.1 Resp. ¶ 135.)

Following discussions he had with Nicola, Gartner retained a law firm, Dentons, to prepare trust instruments into which the Family Trust assets would be decanted for each sister.[6] (Ilaria 56.1 Resp. ¶ 57.) The structure and terms of the trusts, informally referred to as "Newco Trust," were to be different than the Article 3 Successor Trusts provided for in the Family Trust Agreements to address concerns about what would otherwise be the beneficiaries', particularly Ilaria's, unfettered power of appointment and discretion to invade the trust assets. (Gartner Decl. ¶¶ 8-10.) The trust instruments were not, however, to be identical. Unlike the trusts for Veronica and Natalia, Ilaria's trust was to have a capped guaranteed annual distribution, the amount of which was to be discussed. (*Id.* ¶ 12.) Moreover, the Newco Trust as actually drafted for Ilaria pre-designated Gartner as co-trustee and required that upon her death, Ilaria who had no children or other descendants, would leave one-third of remaining funds to Veronica, Natalia, or their children. (*See* Veronica 56.1 Resp. ¶¶ 168-79.) In short, Ilaria's Newco Trust would

---

[6] The extent to which Gartner discussed with Nicola concerns about Ilaria and whether Gartner would or should retain a firm to draft new trusts is disputed. (Ilaria 56.1 Resp. ¶ 56.)

contain terms that were considerably more restrictive than those under the terms set forth by the Family Trust Agreements.

In or about February 2020, Veronica told Ilaria that she should meet with Gartner to discuss the trusts. (Ilaria Decl. ¶¶ 27-28; *see also* Veronica 56.1 Resp. ¶ 143.) Ilaria did that and more, attending several meetings about the Family Trusts and the need to establish successor trusts.[7]  On February 10, 2020, Ilaria met with Gartner and Nicola; she met with Dumont on February 13, 2020; and on February 14, 2020, she again met with Gartner.[8]  (Dumont Decl. ¶ 14; Veronica 56.1 Resp. ¶¶ 145, 147.)  The parties dispute exactly what was said during the meetings (*see, e.g.*, Veronica 56.1 Resp. ¶ 148), but Ilaria asserts that she was told that she had to agree to the Newco Trust structure for tax reasons and believed that if she did not agree she would face financial hardship and alienation from her family. (Ilaria Decl. ¶¶ 30, 34.)

---

[7] Veronica had not discussed the Family Trusts with Ilaria for the first three months following Anna's death in October 2019, even though the sisters were in regular contact. (Veronica 56.1 Resp. ¶¶ 139-40.)

[8] The meetings also included Ilaria's boyfriend Jan Boyer. (Dumont Decl. ¶ 11; Veronica 56.1 Resp. ¶ 147.)  The parties dispute the extent to which Boyer has or has not influenced Ilaria and may be interested in benefitting from Family Trust assets.  That fact issue, however, is immaterial to the instant motion.  So is Ilaria's conclusory counter insinuation that Veronica's husband, Haimo, "has long sought to exert influence within my family and to advance his own interests above those of the rest of us." (Ilaria Decl. ¶ 91.) The parties also dispute when Ilaria first became aware that she was a contingent beneficiary of the Family Trusts.  (Ilaria 56.1 Resp. ¶ 30; Veronica 56.1 Resp. ¶¶ 136-38, 145.)  Veronica contends that Ilaria was made aware no later than November 8, 2006. Ilaria asserts that she did not know about the Family Trusts before Anna's death in 2019. (Ilaria Decl. ¶¶ 19-21.)  Email correspondence from November 2006 shows that at least attorneys representing Ilaria in her in divorce proceedings were on notice that she was a beneficiary of family trusts.  (Dumont Decl. ¶¶ 8-10, Exs. A, B.)  That fact issue is immaterial to the instant motion.

During March 2020, Dumont and Gartner exchanged drafts of the Newco Trust. (Dumont Decl. ¶¶ 15-16; Veronica 56.1 Resp. ¶¶ 150-51.)  On April 10, 2020, Gartner sent a copy of the Newco Trust papers to Ilaria, acknowledging that he had been slow to get them to her.  (Ilaria 56.1 Resp. ¶ 62; Veronica 56.1 Resp. ¶ 152.)  Gartner then met with Ilaria to go over its terms.  At the meeting, Gartner explained that the Newco Trust removed Ilaria's limited power of appointment (as would have been available under the Article 3 Successor Trusts), because Nicola was concerned that the limited power of appointment could give opportunistic suitors incentive to take advantage of Ilaria in the future.  Gartner advised Ilaria that she should hire independent counsel to advise her about the trust documents.  Gartner explained to Ilaria that whether she agreed to the particular trust terms was entirely up to her but that she needed to decide so that initial distributions could be made. (Gartner Decl. ¶¶ 13-15.)

During May 2020, Veronica repeatedly urged Ilaria that she needed to sign the successor trust agreement so that Veronica could move forward with distributing the Trust #1 assets.[9]  (Ilaria 56.1 Resp. ¶ 63; Veronica 56.1 Resp. ¶¶ 153-61.)  The parties dispute, however, the extent to which Veronica was involved with trying to foist the Newco Trust on Ilaria in place of the Article 3 Successor Trust.  There is no evidence that Veronica was involved in drafting or determining the terms of the Newco Trust; Veronica attests that she was not.  (Veronica Decl. ¶¶ 66-68; *see also* Gartner Decl. ¶ 16.)  Indeed, she

---

[9] Ilaria suggests that Veronica dishonestly told her on May 11, 2020, that Veronica and Natalia were probably going to sign their trust documents within the week, when in fact Natalia had not seen a draft of her trust document until later in May. (Compare Veronica 56.1 Resp. ¶ 156 with *id.* ¶¶ 162-63.)  There is no indication that, as of May 11, 2020, Veronica was aware that Natalia had not already received or been informed about the terms of her successor trust.  But as all reasonable inferences must be drawn in favor of Ilaria as the non-moving party, the Court accepts Ilaria's characterization.

never heard of the Newco Trust prior to reading the complaint in the instant action. (Veronica Decl. ¶ 66.)  Veronica testified she had not seen a draft of the Newco Trust proposed to Ilaria; rather, Veronica had seen the terms of her own draft trust that was modeled on the draft sent to Ilaria in April 2020, believed the terms were identical to Ilaria's, and so represented to Ilaria.  (Ilaria 56.1 Resp. ¶ 61; Veronica 56.1 Resp. ¶¶ 158 (Veronica telling Ilaria, "Yes, they're the same"), 165.)   There is no evidence to the contrary.

Ultimately, Ilaria decided not to agree to the Newco Trust because she found the terms less favorable than the terms contemplated by the Trust Agreements, and she had concerns about Gary Gartner serving as her co-trustee since he was Nicola's advisor. (Veronica 56.1 Resp. ¶ 167.)  Veronica learned of Ilaria's decision in August 2020.  (Ilaria 56.1 Resp. ¶ 64.)  Accordingly, the sisters moved forward with the Article 3 Successor Trusts set forth in the Trust Agreements.

E.    Ilaria's Requests For Trust-Related Documents

On March 13, 2020, a few weeks after Ilaria met with Gartner, Dumont, and Nicola about the Family Trusts, Ilaria requested Veronica provide her with documents related to Trust #1.  (Veronica 56.1 Resp. ¶ 180.)  At a later date, Ilaria reiterated her request for Trust #1 documents, specifically account statements.  In response, on April 26, 2020, Veronica explained in an email that "in accordance with [Anna]'s custom" and due to concerns about privacy and protecting family interest, Veronica would not provide account statements by email or otherwise to Ilaria or anyone else for that matter.   Instead, Veronica noted that Ilaria would shortly be having a "follow-up meeting" with the Morgan Stanley advisors, who were cc'd on the email and would "give … all the details in

11

conversation." Veronica noted that Ilaria could take notes of stocks, performance, and the like but asked that she either discard or keep the notes in a safe place and not share them with anyone. (*Id.* ¶ 181; Boies Decl. Ex. S.)

During a May 11, 2020 call with Veronica, Ilaria explained that she was asking for information about the Family Trusts because she had not been previously informed and felt that "maybe it's time [to] get informed" and to "ask the questions I didn't feel was appropriate before this." (Veronica 56.1 Resp. ¶ 182.) After Ilaria sent another email about account statements, Veronica responded on May 16, 2020, that she "was taken aback" because of the meeting Ilaria had with the Morgan Stanley advisors where "it was made clear that," due to concerns for confidentiality and sensitivity of the information, "account statements would not be circulated at any time before the trust is divided into three parts." Veronica added that if Ilaria still wanted information, she could call the Morgan Stanley advisors who again were cc'd on the email. (*Id.* ¶ 183; Boies Decl. Ex. YY.)

During July, August, and September 2020, Ilaria, primarily through her attorney at the time, Gary Freidman ("Freidman"), made numerous requests for information related to the Family Trusts. On July 8, 2020, Ilaria's attorney emailed Dumont requesting Morgan Stanley account statements for Trust #1 for the period of October 2019 to June 30, 2020. On July 9, 2020, Freidman also requested information and documents relating to Trust #2. Dumont provided the Trust #2 materials the following day. As to Trust #1, however, Dumont replied, consistent with what Veronica had previously told Ilaria, that Veronica had decided not to distribute account statements to anyone for reasons of security and privacy but that Ilaria would have full access to statements for her own

12

successor trust once established.  (Veronica 56.1 Resp. ¶ 184; Dumont Decl. ¶¶ 18-19; Boies Decl. Ex. ZZ.)

Ilaria discussed the same issue with Veronica (and Natalia) during a telephone conversation in mid-July 2020, during which Veronica reiterated her concerns.  (Veronica 56.1 Resp. ¶ 186.)  Then, in response to another email from Freidman, Dumont proposed that Veronica would make monthly account statements available in hardcopy form to Ilaria's lawyers, who could take notes but not make copies or photos, and subject to a nondisclosure and confidentiality agreement.  (*Id.* ¶ 187; Dumont Decl. ¶ 20; Boies Decl. Ex. BBB.)  On July 20, 2020, Freidman rejected the proposal and again demanded the account statements, stating that confidentiality would be better preserved by simply providing the documents rather than facing a Surrogate's Court proceeding or compelled accounting.  (Veronica 56.1 Resp. ¶ 188; Dumont Decl. ¶ 21; *see also* Boies Decl. Ex. DDD (Veronica email to Morgan Stanley stating that "Ilaria's lawyer insists on seeing the document (or is threatening to start a lawsuit)").)

The following day, Dumont provided Freidman with the Morgan Stanley account information for the months requested in the form of an investment summary with certain family-identifying information redacted.[10]   (Veronica 56.1 Resp. ¶¶ 189-91.)  Veronica was involved in discussions with Morgan Stanley about what information to provide Ilaria and made decisions in that regard.  (*See id.* ¶¶ 194-96 (citing Morgan Stanley deposition

---

[10] Although the summary report is not the same document as monthly account statements, it is described as containing holdings, valuation, performance, and all cash transactions for the entire period requested.  The statement appears to contain that information on a detailed day-by-day basis.  (*See* Veronica 56.1 Resp. ¶ 191; Boies Ex. CCC, DDD.)  Ilaria has not pointed to any harm she incurred by having received the account information in the form provided.

testimony).)  On August 11, 2020, Dumont provided Freidman with additional information about Trust #2.  (Dumont Decl. ¶ 23.)  A month later, while Veronica was vacationing in Italy, Ilaria's attorneys asked Dumont for additional information about the Family Trusts. Dumont responded that he forwarded the requests to Veronica and that she would respond upon her return.  (Boies Decl. Ex. FFF.)

## F.     Rising Tensions

In September 2020, Veronica participated with Gartner, Haimo, and Dumont in drafting a letter for Nicola to send to Ilaria, a version of which Nicola ultimately sent.[11] (*See id*. Ex. WWW.)  The draft expressed concern about Ilaria's having hired a litigation firm and accusing Veronica of bad faith.  The draft urged Ilaria to "make amends and call it off" and warned, "[i]f you continue to do this, you will be putting yourself outside the family.  You must stop immediately or face the consequences which will be severe and irreversible."   (Boies Decl. Ex. N at 174:4-177:11;  *id.* Ex. W.)  Frustrated with Ilaria's actions and what Haimo and Dumont viewed as "a waste of time and money," Veronica, Gartner, Haimo, and Dumont also considered including language making it clear that Veronica would not deal with Ilaria's attorney Freidman.  Indeed, Veronica characterized Ilaria's lawyers as "toxic."  (Boies Decl. Ex. SSS.)

Recognizing that Nicola was "not in a position" to tell Ilaria to fire her attorneys, however, Gartner commented that he "ha[d] to imagine that the lack of funds will be

---

[11] Also in September 2020, Veronica, Haimo, Dumont, and Gartner considered and took steps toward having Veronica withdraw as trustee of the Family Trusts and replaced by Gartner. (Veronica 56.1 Resp. ¶¶ 224-228.)  Ultimately, they did not implement that plan. Although Ilaria asserts that the papers effecting the replacement were signed and notarized, the evidence cited does not support that assertion.  (*Id*. ¶ 228.)  In any event, the dispute is immaterial; Veronica remained trustee of the Family Trusts.

causing [Ilaria] to end this silliness sooner rather than later." Haimo responded, "Ok, then we just ignore these lawyers and continue playing the clock." (Boies Decl. Ex. U at ECF 11-12; *see also id.* Ex. TTT (Haimo expressing view a few days later that Ilaria was "now pressing on the money front"); *id.* Ex. UUU (Veronica stating that "the clock is ticking" in response to Dumont's email that Ilaria's attorney Freidman was "suddenly very polite").)

Ilaria apparently did experience a reduction in financial resources. Near the end of September 2020, Ilaria stopped receiving funding and payment of expenses from Nicola as well as the Filicaia Trust – a revocable trust established by Nicola having no relationship to the Family Trusts and for which Veronica is not trustee – and the Filicaia Trust's disbursing agent, Elystone, which is controlled by Nicola.[12] (Veronica 56.1 Resp. ¶ 233; Ilaria Decl. ¶ 62.) According to Ilaria, those were the only sources of funds for payment of her living and personal expenses.[13] (Boies Decl. Ex. XXX at ECF 3.)

On October 16, 2020, Ilaria asked Veronica for a one-time distribution of $480,000 from Trust #1 to cover "medical, professional, maintenance, and other expenses." Veronica forwarded the request to Dumont and Gartner, and Dumont looped in Haimo.[14]

---

[12] Ilaria also asserts that in July 2021, she learned she had been denied use of a property that is an asset of the Filicaia Trust. (Ilaria Decl. ¶ 77.) Ilaria also cites to an illegible draft letter in a March 30, 2021 text exchanged between Gartner and Veronica; Ilaria describes the draft letter as being from the trustee of the Filicaia trust and reminding Ilaria that the trust is revocable and that it may be necessary to sell the New York City apartment in which Ilaria had been residing. (Veronica 56.1 Resp. ¶¶ 243-44.) Ilaria does not allege who drafted the letter or whether it was even sent.

[13] According to Veronica, at around the same time Nicola discontinued funding Ilaria, he also stopped giving money to Ilaria and Natalia. (Veronica Decl. ¶¶ 56, 58.) Natalia's declaration is silent on that subject.

[14] Haimo commented that Veronica had reason to ask Ilaria for a three-month budget with supporting documentation. He added, "Let's see how Ilaria enjoys having to produce documents. What goes around comes around!" (Boies Decl. Ex. XXX at ECF 2.)

15

(Boies Decl. Ex. XXX.)    The following day, Gartner requested, and received from, Elystone a list of Ilaria's outstanding expenses, which included medical bills she requested be paid, but which "we have withheld."  Gartner forwarded that information to Veronica, Haimo, and Dumont.[15]  (Boies Decl. Ex. VVV.)

In or about November 2020, Ilaria threatened to initiate litigation to compel a distribution.    (Veronica 56.1 Resp. ¶ 238.)    As discussed below, Ilaria did make a distribution in November 2020, after Ilaria identified a co-trustee and provided bank account information.[16]

## G.    Distribution Of The Family Trust Assets

Veronica could not make distributions of the Family Trust assets to the sisters' individual successor trusts without certain items falling into place.  First, the sisters needed to settle upon the terms of and execute their successor trust agreements.

---

[15] In an October 29, 2020 email, Dumont wrote, "Gary, I think that you mentioned that Switzerland was still making payments to the UK. Is it possible to stop those payments as well?" (Boies Decl. Ex. YYY.) Ilaria characterizes that statement to mean that Dumont wanted to see if they (Dumont, Haimo, and Gartner) could get Nicola to stop making payments for some of Ilaria's living expenses in the United Kingdom." (Veronica 56.1 Resp. ¶ 236.)

[16] Another source of tension for Ilaria and Veronica concerned the Millbrook residence. Ilaria asserts that Veronica denied Ilaria access to the Millbrook property, while Veronica enjoyed full access, forcing Ilaria to remain in New York City. As support, Ilaria cites to her own deposition testimony that she "could not go and stay in [Millbrook]."  More particularly, "During COVID, it would have been nice to spend more time there, and I wasn't allowed." (Boies Decl. Ex. M at 224:3-13.)  Those assertions ignore Ilaria's testimony immediately following those statements in which she grudgingly conceded that it was her father Nicola who disallowed her, saying "[s]omething along th[e] lines" of it being dangerous for Ilaria to stay in Millbrook during COVID. (*Id.* at 224:14-225:9.)  And, while Ilaria says she has "not accessed" any part of the Millbrook property since October 18, 2020, she does not assert that she could not access the property if she wanted to or that she even tried to do so. (Ilaria Decl. ¶ 67.)

16

Second, Veronica believed, each sister needed to designate a co-trustee, subject to approval by the other two sisters.[17]  Third, that sister or her co-trustee needed to provide bank account information so that assets could be deposited there.  (*See* Veronica Decl. A (Trust #1 Agreement) at Art. 12 §§ B-D (provisions for appointment of trustees and co-trustees); *see also* Dumont Decl. ¶¶ 25 ("Ilaria's successor trusts could not be funded without her nomination of a co-trustee", 28 ("Prior to receiving [wire transfer] instructions, Veronica could not distribute Trust #1 assets to Ilaria's successor trust"); Boies Decl. Ex. N at 78:2-7 (Ilaria's lawyer asking and receiving confirmation from Veronica that accounts had to be opened in order to make distributions).)

As described above, a successor trust agreement was not finalized until Ilaria made her decision to reject the Newco Trust structure in August 2020.  Veronica had not taken steps to distribute the trust assets prior to that time.  (Boies Decl. Ex. N at 140:6-11.)  On August 31, 2020, Veronica informed Ilaria and Natalia of "the steps we will be taking over the next month or so in order to fund our Personal Trusts" and asked Ilaria and Natalia to name their proposed co-trustee by September 11, 2020.[18]  (Ilaria 56.1

---

[17] Ilaria disputes as a legal issue the proposition that distributions could not be made before the sisters designated and approved each other's co-trustees.  (Ilaria 56.1 Resp. ¶ 65; *see also* Boies Decl. Ex. HH at 79:5-6 (Ilaria's attorney Freidman testifying that he "think[s]" a distribution could be made without a co-trustee in place).)  Neither party has provided legal analysis of the issue.  Ilaria has not disputed that Veronica nevertheless was of the view that distributions could not be made without appointment of the co-trustees.  (*See* Veronica 56.1 Resp. ¶ 142 (Ilaria contending that "[t]o begin distributing assets of Trust #1, Veronica needed only to ask the bankers to divide the assets three ways and – in Veronica's view – co-trustees had to be appointed").)

[18] On July 17, 2020, the sisters exchanged texts about the trust matter.  Ilaria asserts that until then, Veronica had not yet mentioned to her sisters about the need to appoint co-trustees.  It is unclear from the deposition dialogue whether what was not previously known was the need to appoint co-trustees, or the need for approval of each co-trustee by the other two sisters.  (*See* Veronica Resp. 56.1 ¶¶ 219-20.)  The issue is not material

Resp. ¶ 66; Veronica 56.1 Resp. ¶ 222.)   On September 9, 2020, Ilaria asked for additional time to select a co-trustee.  The following day Veronica named Dumont as co-trustee for both Veronica and Natalia.  On October 2, 2020, Ilaria named Robert Sheehan to be her co-trustee and received consent from both Veronica and Natalia within two weeks.  On October 8, 2020, Ilaria consented to Dumont as co-trustee for her sisters' trusts.  Finally, on November 2, 2020, Ilaria's counsel provided the bank information needed for Veronica to distribute funds to Ilaria's trust. (Ilaria 56.1 Decl. ¶¶ 68-71; Dumont Decl. ¶ 27.)

During October 2020, Veronica, with legal assistance from Haimo, took steps to consolidate the three Millbrook properties under common ownership of a holding company, 1935 Holding LLC, held by Trust #1.  The stated purposes of doing so included, among others, achieving certain financial advantages and facilitating distribution of equal interests in the Millbrook properties to each sister's trust.[19]  (Ilaria 56.1 Resp. ¶¶ 72-79.) Ilaria contends that ownership of the 43-94 Home Free portion of the Millbrook properties was not properly recorded because New York State property records identify the owner

---

to resolution of the instant motion.

[19] Ilaria disputes Veronica's stated purposes for consolidating the Millbrook properties under a corporate entity on the basis that the holding company agreement permitted directors to be removed with or without cause by a vote of the members, "suggesting" that the real purpose behind forming [the holding company] was to create a mechanism whereby Veronica and Natalia could vote out Ilaria and deny Ilaria access to and control over the Family Trusts' real property assets."  (Ilaria 56.1 Resp. ¶ 73.)  That is entirely speculative and never came to pass.  With no actual injury, there is no claim for breach of fiduciary duty.  Similarly, Ilaria casts suspicion on Haimo and Veronica's motives in considering the possibility of replacing Veronica as trustee with Gartner, citing an email from Haimo to Dumont that there was a "Millbrook angle" to the idea in that if Gartner was trustee he could "lockdown the property (which would please us as [Ilaria and her boyfriend Jan] over there are a nightmare)."  (*Id*. ¶ 65; Boies Decl. Ex. Z.)  As noted earlier, that idea was never implemented.

as Verda N.V., even though that entity merged into Verda U.S., which then merged into the holding company, 1935 Holding LLC. (Ilaria 56.1 Resp. ¶¶ 75-76; Veronica 56.1 Resp. ¶¶ 120-21; *see also* Reply Karlan Decl. Ex. VV at No. 29 (Veronica admission that she did not record either Verda U.S.'s or 1935 Holding LLC's ownership interest in 43-94 Home Free with the county clerk).)

As of November 16, 2020, the Family Trust assets, as reflected in Morgan Stanley account statements, amounted to more than $129 million. (Ilaria 56.1 Resp. ¶ 81.) On November 17, 2020, Veronica distributed $20 million from the Family Trusts to each of the three sisters' successor trusts. (*Id.* ¶ 82.) Although "maybe not a priority," Veronica believes she made the first distribution "in a timely fashion." (Boies Decl. Ex. N at 75:10-21.) On December 28, 2020, Veronica made a second distribution to each sister's successor trust in the amount of $15 million. (Ilaria 56.1 Resp. ¶ 83.) On February 1, 2021, Veronica distributed shares of 1935 Holding LLC to each sister's successor trust. (*Id.* ¶ 84.) Finally, on June 15, 2022, Veronica made another distribution to each sister's trust in the amount of $5 million. (*Id.* ¶ 85.)

Putting aside the question of any so-called "missing" assets, the Family Trusts had been fully distributed, save for approximately a $3 million holdback for legal and administrative fees. (Ilaria 56.1 Resp. ¶ 88.) Those funds since have been exhausted. (Veronica Decl. ¶ 65.) To pay the continuing costs for defending the instant litigation, borne by the Family Trusts, Veronica asked that each sister return $1.5 million to the Family Trusts.[20] Veronica and Natalia did so; Ilaria did not. (Ilaria 56.1 Resp. ¶¶ 89-90.)

---

[20] Prior to receiving each distribution, each sister agreed in writing to refund to the Family Trusts any amounts necessary to pay debts, taxes, and expenses of the Family Trusts for which existing liquid funds of the Family Trusts were not sufficient. (Ilaria 56.1 Resp.

**H.      Attempt To Settle, Surrogate's Court Action, And Ilaria's Inquiries**

As tensions rose between Ilaria and Veronica, so did talk of litigation.  As noted above, Ilaria threatened litigation in November 2020.  Veronica, however, proposed to reach a settled accounting that would not require the expense and delay of litigation. (Boies Decl. Ex. FFFF.)   The proposed agreement, provided on December 3, 2020, included mutual releases between each of the sisters.  (*Id.* at ECF 151-52.)  Ilaria did not agree to settling the trust matters.[21]  (*See* Boies Ex. ZZZ.)  Instead, on March 11, 2021, after Veronica had already distributed more than $105 million of the Family Trust assets, Ilaria filed a petition in New York County Surrogate's Court to compel another distribution. (Ilaria 56.1 Resp. ¶ 91.)

Then, already having retained counsel and forensic accountants at Kroll Associates, Inc. ("Kroll") to analyze documents she received in connection with Trust #1, Ilaria, through counsel, sent letters to Veronica's counsel identifying purported "inconsistencies, errors and omissions" and "irregularities" in the trust account statements.  Some of the items identified concerned non-substantive formatting issues, while others addressed more substantive matters such as seeming inconsistency between starting and ending account balances.  There were at least four such letters. (Ilaria 56.1 Resp. ¶¶ 94-95; Karlan Decl. Exs. GG, HH, II, JJ.)  The first was dated April

---

¶ 87.)

[21] On March 12, 2021, Haimo communicated to Gartner about the then latest draft of a settlement proposal and commented "This is our final attempt to resolve the Trust.  If [Ilaria] refuses, stalls, or engages in the same insane paranoid behavior we've seen in the past year, we will have no option but to go nuclear."  (Boies Decl. Ex. U at ECF 24-25.)

27, 2021. (Karlan Decl. Ex. GG.) Less than two weeks later, on May 7, 2021, Veronica's counsel responded requesting more information and a copy of a forensic analysis (prepared by Kroll) to which the April 27, 2021 letter alluded so that Veronica could respond to the questions and concerns.[22] (Boies Decl. Ex. GGG.) Ilaria did not respond to that letter until November 5, 2021, sometime after she hired new attorneys. (Veronica 56.1 Resp. ¶ 202; Karlan Decl. Ex. HH.) Ilaria's counsel reiterated and expanded on the concerns previously identified in May 2021. Their letter included a spreadsheet linking particular account statements to the items of concern based on the Kroll analysis but did not provide a copy of the report itself. Ilaria also requested that Veronica direct Morgan Stanley to send to Ilaria a full set of account statements. The letter closed by proposing that the parties meet to discuss the various issues. (Karlan Decl. Ex. HH.)

Veronica's counsel responded less than a week later, on November 11, 2021. The letter directly answered and explained away many of the purported substantive inconsistencies, and referred to formatting and other discrepancies as immaterial and presumably a function of Morgan Stanley's record-keeping system. The letter again requested the Kroll analysis so that Veronica could conduct a comprehensive review with Morgan Stanley. Veronica's letter declined the request to direct Morgan Stanley to send account statements to Ilaria, and also declined a meeting as premature without Ilaria yet having provided a copy of the Kroll analysis. (Boies Decl. HHH.)

A week later on November 18, 2021, Ilaria's counsel replied, disputing characterization of certain irregularities as immaterial and countering that they were

---

[22] Between Ilaria's April 27, 2021 letter, and Veronica's May 7, 2021, response, Haimo texted Gartner that he had "convinced [Veronica] that the time for appeasement has passed. When you are ready, let's talk about timing." (Boies Decl. Ex. U at ECF 27.)

instead "serious" and "suspicious."  The letter again refused to provide the Kroll analysis, claiming it to be work product and attorney-client privilege, but reiterated a request for a meeting to discuss the issues.  (Karlan Ex. II.)  The same day, Ilaria's counsel also sent a letter directly to Morgan Stanley (and copying Veronica's counsel) that requested Morgan Stanley to explain the same or similar purported discrepancies.  The letter indicated that Morgan Stanley's cooperation "may obviate our need to seek further legal relief."  (Boies Decl. Ex. KKK.)

The fourth letter from Ilaria's counsel concerning the alleged discrepancies came several months later, on March 21, 2022.  The letter acknowledged that some of Ilaria's concerns had been resolved but identified several issues that had not been fully resolved as well as new concerns about Morgan Stanley statements.  The letter again asked for a meeting.  (Karlan Decl. Ex. JJ.)  Veronica's counsel responded on March 24, 2022, with a detailed letter substantively answering many of the issues raised in Ilaria's March 21, 2022 letter; indicating that Veronica already had inquired and would continue to inquire with Morgan Stanley to obtain additional answers; and asking Ilaria to provide copies of specific statements for which she claimed issues had not been resolved.  Veronica also again requested the Kroll analysis to facilitate resolution of purported remaining discrepancies.  (Boies Decl. Ex. LLL.)  Ilaria did not (and never did) provide the Kroll analysis, continuing to claim it as protected.  (Ilaria 56.1 Resp. ¶ 97.)  Veronica's counsel did not agree to a meeting.

By November 2021, Veronica had provided Ilaria with 185 monthly statements from Morgan Stanley covering the period from January 2005 through February 2021.[23]

---

[23] Veronica previously had provided some Morgan Stanley account statements as early

(Ilaria 56.1 Resp. ¶ 93.)  And both before and after November 2021, Veronica worked with Morgan Stanley and others to provide answers about the issues raised by Ilaria. (Karlan Decl. Ex. C at 111:9-114:13, 126:8-23, 127:18-128:4, 160:13-25; Veronica 56.1 Resp. ¶ 205; *see* Boies Decl. Exs. GGG, HHH, LLL.)

## I.    The Judicial Accountings

On July 28, 2022, Veronica, with the assistance of accountants who put in over 900 hours of work, filed accountings of more than 3,000 pages covering the full 17-year lifespan of the Family Trusts in the Surrogate's Court action.  (Ilaria 56.1 Resp. ¶¶ 101-03; Veronica Decl. ¶ 79; Zarett Decl. ¶ 12.)  The accounting was performed by the firm of Marcus Gettry CPA, P.C ("Marcus Gettry).   The accountants found no evidence of suspicious or irregular transactions or that any Family Trust assets are missing.[24]  (Zarett Decl. ¶ 12.)

---

as November 13, 2020, prior to the first distribution on November 17, 2020 (*see* Reply Karlan Decl. Exs. XX, YY), and again on March 12, 2021 (Boies Decl. Ex. LLLL), in addition to the day-by-day summary Morgan Stanley account information that had been provided in July 2020.  (Veronica 56.1 Resp. ¶¶ 189-91.)  Veronica's brief states that Veronica had provided Ilaria with the 185 Morgan Stanley statements in the "spring of 2021," while her 56.1 Statement asserts that the statements were provided "[b]y November 2021."   (Ilaria 56.1 Resp. ¶ 93.)  The evidence cited for the November time frame is the November 5, 2021 letter from Ilaria's current attorneys referencing the earlier April 27, 2021 letter from her previous attorneys alluding to "numerous Morgan Stanley account statements."  (*Id.*, citing Karlan Decl. Ex. HH at 2.)  It thus is not entirely clear by which time Ilaria received a full set of account statements.  Regardless of the specific date, there is no dispute that a full set had not been provided until prior to at least spring 2021.

[24] Veronica emphasizes that Ilaria has not objected to the accountings in Surrogate's Court. (Veronica Mem. at 1, 3, 10, 15, 24.)  Ilaria counters, citing correspondence from Veronica's counsel in Surrogate's Court dated September 1, 2023, that objections to the accountings have been held in abeyance pending certain discovery. (Ilaria Mem. at 19 n.3; Boies Decl. Ex. OOO.) Veronica has not pointed to anything suggesting that the stay has been lifted or, even if it has, whether the time to file objections has expired.  The Court therefore does not ascribe any significance to the absence of such objections.

As a result of Ilaria's inquiries and information provided by Veronica, the parties became aware of a trust account at Barclays. To determine whether the relevant account records could be located, Haimo, on behalf of Veronica, made inquiries to a previous Barclays' employee and to the investment banking firm that had acquired Barclays' asset management business. Those efforts were unsuccessful. (Haimo Decl. ¶¶ 32-38.) Through discovery issued in the instant litigation by Ilaria to Barclays, however, Ilaria obtained thousands of pages of records for Trust #1 accounts at both Barclays and Lehman Brothers. (Veronica 56.1 Resp. ¶¶ 210-216.)

Even though the Marcus Gettry accountants did not have access to the Barclays' documents at the time they prepared and filed the judicial accounting on behalf of Veronica, they determined that the documents already provided to them by Veronica were sufficient to conduct the accountings, and that the later-located Barclays documents made no difference to the finding that there are no missing assets.[25] (Zarett Decl. ¶¶ 14-17, 22.)

### Procedural Background

Ilaria commenced the instant action against Veronica solely in her capacity as trustee on June 16, 2022, alleging both breach of fiduciary duty and negligence. (Dkt. 1.) Veronica filed a motion to dismiss on September 1, 2022. (Dkt. 23.) The motion sought

---

[25] At deposition, a Morgan Stanley corporate representative testified that he had reviewed Family Trust account statements in preparation for his deposition and in doing so found no evidence of missing assets or monies not accounted for. The testimony, however, is of limited significance as the representative stated that he had not reviewed the statements in their entirety and did not testify about whether he affirmatively was looking to determine if there was any evidence of missing or unaccounted for assets. (Karlan Decl. Ex. C at 195:25-198:9.)

24

dismissal primarily based on pendency of the Surrogate Court's Action, as well as insufficiently pled damages. (Dkt. 24.) On May 5, 2023, the Court denied the motion. (Dkt. 249.)

On June 15, 2023, Veronica filed her Answer and Counterclaims. (Dkt. 269.) Veronica's Counterclaims charge Ilaria with breach of fiduciary duty, breach of contract, and abuse of process; they also include claims against Boyer for tortious interference and aiding and abetting Ilaria's breach of fiduciary duty. The Counterclaims are not at issue on the instant motion.

Following completion of discovery,[26] Veronica filed her motion for summary judgment on October 23, 2023. (Dkt. 322.) Ilaria filed her opposition on November 22, 2023, and Veronica replied on December 15, 2023. The case has been referred to me for report and recommendation on dispositive motions, including the instant motion.[27] (Dkt. 319.) The Court heard oral argument on July 11, 2024.

Before addressing the substance of Veronica's summary judgment motion, the Court first resolves each sister's motion to strike certain declarations from the summary judgment record. *See Pugliese v. Verizon New York, Inc.*, No. 05-CV-4005, 2008 WL 2882092 (S.D.N.Y. July 9, 2008) ("Because a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment, it is appropriate to consider a motion to strike prior to a motion for summary judgment") (internal quotations and citation omitted).

---

[26] Discovery moved forward even while Veronica's motion to dismiss was pending. The parties engaged in discovery for well over a year.

[27] The matter also had been referred to me for general pretrial purposes on October 27, 2022. (Dkt. 41.)

**Motions To Strike**

Both Ilaria and Veronica have moved to strike, or obtain alternative relief with respect to, certain declarations submitted by the other.[28]  In the absence of having taken the depositions of Natalia and Nicola, Ilaria seeks to strike their declarations submitted by Veronica in support of her motion for summary judgment.  Veronica moves to strike the declaration of Elizabeth Kay from Kroll, which Ilaria filed in response to Veronica's declaration of Rochelle B. Zarett from the accounting firm that prepared Veronica's trust accounting filed in Surrogate's Court.  Ilaria urges that if the Kay Declaration is stricken in any respect, then so should the Zarett Declaration.  The Court does not deem it necessary to strike any of the declarations.  The Court does, however, find that two of the declarations – those of Nicola and Kay – should be disregarded on this motion.  *See Securities and Exchange Commission v. Mattessich*, 523 F. Supp.3d 624, 633 (S.D.N.Y. 2021) (on summary judgment, court may either strike inadmissible affidavit material or

---

[28] Ilaria filed a letter motion on November 3, 2023, requesting a pre-motion conference in anticipation of filing a formal motion regarding the Natalia and Nicola Declarations.  (Dkt. 336.)  Veronica filed a letter in opposition (Dkt. 337), and the Court held argument to address the issue on November 17, 2023.  The Court reserved decision pending completed briefing on Veronica's motion for summary judgment.  Shortly after Ilaria filed her opposition to summary judgment, Veronica filed a letter motion on November 27, 2023, seeking permission to move to strike the Kay Declaration.  (Dkt. 372.)  Ilaria filed a letter in opposition on November 30, 2023 (Dkt. 374), and Veronica filed a reply on December 15, 2023.  (Dkt. 383.)  Both parties recognize that their respective letter motions, along with the full summary judgment record and briefing, is sufficient for the Court to render a decision on both letter motions.  *See* Dkt. 374 (Ilaria suggesting, "[c]onsistent with how this court handled Plaintiff's pending request to strike the [Nicola and Natalia] declarations," that the Court consider Veronica's motion to strike the Kay Declaration "alongside the complete summary judgment record"); Dkt. 383 (Veronica asking the Court to grant her motion to strike and not asking for any additional briefing on the matter).  Further, at oral argument on summary judgment, neither party requested further briefing on their motion to strike.

26

simply disregard it without striking).  The Court first discusses the declarations of Natalia and Nicola, followed by those from Kay and Zarett.

## A.    Natalia and Nicola

### 1.    The Declarations

Much of Natalia's declaration is duplicative of information set forth elsewhere, including Veronica's declaration.  Natalia attests to the growth of the Family Trust assets, Veronica's service as trustee without compensation, Natalia's receipt of her share of the assets, and the timing of distributions made by Veronica.  (Natalia Decl. ¶¶ 4-11.)  Natalia also corroborates that "[a]ny decisions affecting the Filicaia trust and/or financial support for Ilaria were made solely by … Nicola" and that "Veronica played no part in those decisions."  (*Id.* ¶ 13.)  Natalia also addresses the Millbrook properties, stating that Ilaria always had access and that "she simply chose not to visit."  (*Id.* ¶ 14.)

Nicola's declaration also includes a number of undisputed facts about the Family Trusts that are supplied by Veronica and others.  (Nicola Decl. ¶¶ 3-9.)  But Nicola's declaration also offers information based on Nicola's personal knowledge that other witnesses may not be able to speak to as directly.  For instance, Nicola explains that he was concerned about how Ilaria would handle assets from the Family Trusts; that the Newco Trust was his idea and was meant to protect Ilaria from others taking advantage of her; that Veronica was not involved in Nicola's request to Gartner to have the Newco Trust papers drafted and "never even talked to" Nicola about his decision; that Nicola stopped sending monthly allowances to not just Ilaria but also Veronica and Natalia in anticipation of their receiving a substantial distribution of Family Trust assets; and that

Veronica had no role in Nicola's decision to revoke the Filicaia Trust.  (*Id.* ¶¶ 10-19.) Nicola also speculates about Ilaria's motivations.  (*Id.* ¶ 21.)

### 2.    Ilaria's Failure To Pursue Discovery

As sister to Natalia and daughter of Nicola, Ilaria was well aware even prior to commencement of the instant action of each of their connections to the various family trusts at issue.  Veronica disclosed Natalia as a potential witness in her initial mandatory disclosures.[29]    Veronica did not disclose Nicola as a potential witness, but Ilaria nonetheless expected him to potentially have relevant information as evidenced by her attempt to serve both him and Natalia with subpoenas.  As Ilaria concedes, she "issued subpoenas for both [Nicola] and Natalia's deposition, though she could not serve them." (Dkt. 336 at 1.)  Ilaria no doubt had difficulty serving Nicola and Natalia as both live outside the United Sates.  But at no time did Ilaria attempt to serve Nicola or Natalia with discovery through the procedures designed for service abroad under the Hague Service Convention.  Nor has Ilaria indicated that she reached out directly to either Natalia or Nicola, or their counsel, to obtain their cooperation.  In short, Ilaria did not pursue means available to her to obtain the depositions of Natalia and Nicola.  Yet with discovery closed and Veronica having moved for summary judgment, Ilaria now argues she should be permitted to depose Natalia and Nicola pursuant to Fed. R. Civ. P. 56(d) or, alternatively, that their declarations be stricken pursuant to Fed. R. Civ. P. 37(c)(1).

---

[29] Ilaria also was aware that Veronica would rely on Natalia when Veronica submitted a declaration from Natalia dated November 9, 2022, in support of Veronica's motion to dismiss. (Dkt. 52.) Although the Court rejected the filing as untimely (Dkt. 54), Veronica's submission of the declaration demonstrated Veronica's reliance on Natalia's testimony.

### 3.    No Relief Under Rule 56(d)

Ilaria does not have grounds for relief under Rule 56(d).  That rule provides the court with discretion to defer or deny a motion for summary judgment, allow declarations to be obtained, discovery to be taken, or issue other relief "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d).  Ilaria has not met that requirement.  She did not submit an affidavit or declaration explaining why she cannot present facts sufficient for her opposition.  Moreover, although she raised a Rule 56(d) argument prior to filing her opposition to Veronica's motion, Ilaria does not mention Rule 56(d) anywhere in her opposition brief.  The Court therefore deems the argument abandoned as well as deficient.  In any event, as noted above, Ilaria had sufficient opportunity to pursue discovery from Natalia and Nicola but failed to take steps necessary to secure their depositions.  That failure also is grounds to deny a Rule 56(d) motion.  *See Moccia v. Saul*, 820 F. App'x 69, 70 (2d Cir. 2020) ("It is well established that the trial court may properly deny further discovery under Rule 56(d) if the nonmoving party has had a fully adequate opportunity for discovery") (internal quotation marks omitted).

### 4.    Partial Relief Under Rule 37(c)

Ilaria also gains no ground under Rule 37(c)(1), at least with respect to Natalia. The rule dictates that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c).  "Despite the seeming[ly] self-executing nature of the preclusion sanction[,]" its imposition "remains within the trial

29

court's discretion." *Cates v. Trustees of Columbia University in City of New York.*, 330 F.R.D. 369, 373 (S.D.N.Y. 2019). It is undisputed that Veronica disclosed Natalia as a potential witness on whom she might rely in her initial mandatory disclosures pursuant to Rule 26(a). There thus is no basis to disallow Veronica from relying on Natalia's declaration.

Nicola's declaration, however, presents a more compelling case for preclusion, even taking into account that "[p]reclusion of evidence is generally a disfavored action." *American Stock Exchange LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002). First, Veronica did not disclose Nicola as a witness on whom she may rely to prove her case. Veronica did not do so either in her initial mandatory disclosures or at any later point in discovery. To the contrary, Veronica consistently steered Ilaria away from Nicola on the basis that he "has nothing to do with this case." (Dkt. 221 at 2 (May 2, 2023 letter from Veronica's counsel opposing third day of deposing Gartner because "none of these topics involve Defendants or the Trusts, but rather all concern Mr. Bulgari").) Indeed, at oral argument (on November 17, 2023), Veronica's counsel reiterated that Nicola does not have "anything to do with the core dispute here." (11/17/2023 Tr. at 7.) Counsel also suggested that Nicola's declaration says nothing new because certain paragraphs of the declaration "simply confirm what Mr. Gartner and Mr. Dumont testified to at their depositions." (*Id.*) When asked why Veronica submitted the declaration if Nicola does not have anything to do with the case, counsel said it was to refute hearsay and baseless statements by Ilaria. (*Id.* 9.) Yet, Veronica's counsel represented that he has "no intention to call [Nicola] as a witness at trial" and "no reason to believe I have the ability to get him here for trial." (*Id.* at 14.)

Under these circumstances, the Court finds that Nicola's declaration should be disregarded for purposes of the instant motion.[30]   Veronica did not disclose him as a witness on whom she may rely, and she repeatedly took the position that Nicola has nothing to do with the case.   That is the type of practice toward which Rule 37(c) is directed.   *See Preuss v. Kolmar Laboratories, Inc.*, 970 F. Supp.2d 171, 175 (S.D.N.Y. 2013) (Rule 37(c)'s "purpose is to 'prevent the practice of 'sandbagging' an opposing party with new evidence'") (quoting *Ebewo v. Martinez*, 309 F. Supp.2d 600, 607 (S.D.N.Y.2004)).   Although Ilaria was well aware of Nicola's existence and could have pursued service under the Hague Convention and chose not to, she had less incentive to do so given Veronica's repeatedly urging that Nicola was irrelevant to the case and his not having been included as a witness on whom Veronica would rely.[31]   There is

---

[30] In determining whether to preclude evidence under Rule 37(c)(1), courts examine: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."   *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir.2006) (alterations and internal quotation marks omitted).   The discussion above addresses the first three factors.   As to the fourth factor, a continuance would draw out proceedings by many months, and likely would not be productive; Nicola lives outside the U.S., there is no reason to believe he would voluntarily appear for a deposition, and all agree that seeking to obtain his deposition through the Hague Convention would be a lengthy, and uncertain process.

[31] "[A] failure to disclose witness information is 'harmless' if the other party was well aware of the identity of the undisclosed witness and the scope of their knowledge well before trial."   *Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*, No. 01-CV-1047, 2002 WL 31108380, at *2 (S.D.N.Y. Sept. 23, 2002) (internal citation omitted).   Courts thus have found, depending on the circumstances, that the failure to disclose potential witnesses who were known to the opposing party does not warrant precluding the witnesses' testimony.   *See, e.g., Preuss*, 970 F. Supp.2d at 177 ("Although Defendant should have complied more diligently with the discovery rules, its failure to disclose Dussinger, Matyus, or Bock as potential witnesses does not warrant the severe sanction of striking their testimony because Plaintiffs were well aware of their identities and the scope of their knowledge").   Although Ilaria of course knew of her father and his involvement with the

considerable prejudice to Ilaria in allowing admission of Nicola's declaration since Ilaria has not deposed him, while Veronica does not expect to call Nicola as a witness at trial and would not expect Nicola to appear even if she did.  In contrast, there is little prejudice to Veronica from exclusion – by her concession, she has submitted declarations and deposition testimony from other witnesses, such as Gartner and Dumont, who already assert many of the same facts.  Veronica and Natalia also attest to some of the same facts, even if not with the same direct knowledge.  And, if indeed Nicola's declaration merely rebuts hearsay or baseless accusations, the statements he seeks to refute are likely not admissible thereby diminishing whatever importance his declaration may have.

In any event, even if the Court were to consider Nicola's declaration, the outcome of Veronica's summary judgment motion would be no different.  Genuinely disputed material facts would remain.  For instance, and as discussed below, regardless whether Newco Trust was Nicola's idea or whether Veronica spoke with Nicola about it, there is evidence that Veronica pressured Ilaria to approve it.

## B.    Zarett and Kay

### 1.    The Declarations

Zarett is the Trust & Estate Group Leader at Gettry Marcus.  (Zarett Decl. ¶ 1.) Veronica retained Gettry Marcus to prepare judicial accountings for the two Family Trusts, which they did over the course of more than 900 hours, producing an accounting of more than 3,000 pages.  (*Id.* ¶¶ 3, 13.) Zarett's declaration briefly summarizes the procedures employed to conduct the accountings (*id.* ¶¶ 4-7, 9-10), and attests that the accountings

---

Family Trusts, the Court is not aware of any decision finding that nondisclosure was harmless where the opposing party affirmatively represented that the witness had nothing to do with the case.

were filed in Surrogate's Court on July 28, 2022 (*id.* ¶ 13).  Additionally, Zarett renders certain opinions even if not couched as such.  She thus asserts that the trust-related records provided by Veronica, through counsel, "were adequate to prepare the comprehensive judicial accountings of the Trusts" and that based on review of those documents, the accountants "saw no indication that any assets were missing and did not identify any unusual transactions nor evidence that any assets of the Trusts were unaccounted for." (*Id.* ¶¶ 12, 22; *see also* ¶¶ 17-21 (analyzing various transfers and refuting Ilaria's allegation that Veronica cannot account for millions of dollars of assets), ¶ 23 ("we have concluded that there is no evidence of suspicious or irregular transactions, or that assets are missing").)  Zarett also attests that trust records obtained from Barclays after the accountings were submitted do not change the firm's conclusions.  (*Id.* ¶ 16)

Kay is an Associate Managing Director in Financial Investigations and Intelligence for Kroll.  (Kay Decl. ¶ 1.)  Like Zarett, Kay identifies her credentials and those of the team she supervised and describes the procedures they used in reviewing the financial records produced by Veronica and additional records obtained by subpoena.  (*Id.* ¶¶ 1-10.)  Kroll also reviewed the judicial accountings filed by Veronica in Surrogate's Court, as well as the Zarett declaration. (*Id.* ¶¶ 11-12.)  Kay offers opinions that counter Zarett's opinions, but she also offers opinions that go beyond what Zarett addressed.  Kay opines that account statements produced by Veronica contained numerous "errors, omissions, and inconsistencies" not all of which were explained (*id.* ¶¶ 13-21); that "[t]he timing of when Veronica Bulgari became co-trustee remains unclear" (*id.* ¶¶ 22-24); that Kroll still "was unable to fully reconcile millions in Trust #1 funds" from documents produced by Veronica (*id.* ¶¶ 25-31); that the Zarett declaration does not account for all assets of Trust #1 (*id.*

33

¶¶ 32-36); and that two transfers totaling $1,207,176 remain unaccounted for (*id.* ¶ 45). Kay also comments on funds used to make purchases for the Millbrook properties, the corporate standing of the entities involved in consolidating the Millbrook properties, and the decline in value of Trust #1 assets between the time Veronica made her second and third distributions from the Trust. (*Id.* ¶¶ 37-41.) Finally, Kay asserts that Kroll has devoted hundreds of hours to reviewing and analyzing the trust-related documents and that Ilaria paid for the services charged. (*Id.* ¶ 42-43.)

## 2. The Parties' Contentions About Zarett And Kay

Veronica objected to Ilaria's filing of the Kay declaration just days after it was filed. (Dkt. 372.) Veronica argues that Kay is an undisclosed expert and that Ilaria repeatedly represented that she would not be proffering an expert, that Kroll in particular would not be offered as an expert, and that Ilaria would not rely on the substance of Kroll's analysis. Rather, Ilaria claimed as damages her expenditures for Kroll's investigation and analysis, and successfully objected to producing the substance of Kroll's analysis during discovery on the basis of work product and attorney-client privilege. In defending her refusal to produce the Kroll analysis, Ilaria stated unequivocally that she "is not relying on the substance of Kroll's analysis or related emails to prove any element of her claims." (Dkt. 252 at 7.) "Instead," she informed the Court, "the only relationship between Kroll's analysis and the claims in the case is that [Ilaria] seeks to recover the fees she paid to Kroll as part of her damages because she never would have incurred those fees but for Defendant's misconduct." (*Id.*) If that were not clear enough, Ilaria added "Kroll is not a testifying expert." (*Id.* at 9.)

34

In response, Ilaria argues that Zarett is an undisclosed expert and that the Key declaration rebuts Zarett's undisclosed expert opinions. (Dkt. 374 at 2.) As Ilaria puts it, by submitting the Zarett declaration, Veronica "opened the door to rebuttal evidence." *Id.* To the extent the Kay declaration addresses matters beyond the substance of the Zarett declaration – which it does – Ilaria argues that Kay is merely a "summary witness" who provides "a summary of the documents that Kroll reviewed" and what "Kroll uncovered as part of its review without rendering any legal conclusions." (*Id.* at 3.) Ilaria takes the position that either both the Zarett and Kay declarations should be allowed, or neither should be allowed. (*Id.* at 1.) That oversimplifies the matter. Because Kay is positioned as rebuttal to Zarett, the Court first addresses Zarett.

### 2. Zarett

Expert opinion testimony must be disclosed under the federal rules of civil procedure. Fed. R. Civ. P. 26(a)(2). A party who fails to timely disclose an expert risks preclusion pursuant to Rule 37(c)(1). Although exclusion of evidence is discretionary and not favored, "[c]ourts in the Second Circuit regularly prohibit reliance on an expert affidavit at summary judgment where the expert or his report was not timely disclosed." *State Farm Fire and Casualty Company v. Omega Flex, Inc*., 20-CV-648, 2023 WL 2666676, at *7 (D. Conn. Mar. 28, 2023) (citing cases); *see also Caruso v. Bon Secours Charity Health Systems, Inc.*, 703 F. App'x 31, 33 (2d Cir. 2017) (affirming preclusion of expert reports from consideration in opposition to summary judgment where the experts were not previously disclosed). Veronica did not make any expert disclosures; nor did Ilaria.[32] And neither offers any excuse for failing to do so.

---

[32] In the initial scheduling order, the parties and the Court left blank the portions related

Recognizing as much, Veronica defends the Zarett declaration as providing only facts, not expert opinions.  According to Veronica, "Zarett's testimony is being offered as that of a fact – not expert – witness based on Ms. Zarett's personal involvement in and knowledge of the creation of the judicial accountings on the Family Trusts."  (Dkt. 383 at 2.) And, since Zarett is merely a fact witness, there is no unfair surprise because Veronica previously identified as a potential witness "one or more past or current employees of Gettry Marcus."  (*Id.* (quoting Plaintiff's letter at Dkt. 374 at 1.)

Some portions of the Zarett declaration are indisputably factual.  Those include, for example, the facts that Veronica's lawyers engaged Gettry Marcus to prepare the judicial accountings, that Gettry Marcus did prepare them and spent hundreds of hours to do so, and that the accountings were submitted to Surrogate's Court.  Those portions of the Zarett declaration are admissible and may be considered by the Court.  Other aspects of the Zarett declaration are conclusions based on the financial records Gettry Marcus reviewed.  The accountants thus "saw no indication that any assets were missing and did not identify any unusual transactions nor evidence that any assets of the Trusts were unaccounted for" (Zarett Decl. ¶ 12), that the Barclays records obtained after submission of the accountings "do not change our conclusion (*id.* ¶ 16), and that "[t]he judicial accountings, reinforced by the later-received records from Barclays, show no evidence of missing assets" (*id.* ¶17).

Because Zarett has not been disclosed as an expert, her conclusions may be considered only if they are facts or lay opinion, which is admissible pursuant to Federal

---

to experts.   (*See* Dkts. 18-1 ¶ 9, 20 ¶ 9.)   Neither party ever sought to amend the scheduling order to provide for expert discovery.

Rule of Evidence 701.  It would strain credulity to characterize Zarett's conclusion as purely fact and not opinion.  Her firm was hired by Veronica's attorneys to perform an accounting analysis to reach conclusions based on over 900 hours of work, generating an accounting submission of more than 3,000 pages.  The Court has less difficulty, however, in characterizing Zarett's conclusions as lay opinion.  To be admissible as lay opinion, the testimony must meet three requirements:  it must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Zarett's declaration testimony readily satisfies the first two requirements.  The pivotal question is whether her testimony is based on technical or other specialized knowledge that is not merely the "'result[ ] from a process of reasoning familiar in everyday life.'"  *United States v. Cuti*, 720 F.3d 453, 459 (2d Cir. 2013) (quoting Fed. R. Evid. 701 advisory committee's note, 2000 amend).

Cuti was an appeal from a fraud conviction in which the defendant claimed the district court erred in admitting testimony from two lay witnesses as to what the accounting treatment of certain transactions would have been absent the fraud.  At trial, the government elicited testimony from both the company's in-house accountant and its external auditor about "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements."  *Id.* at 456.  The defense objected

"to the use of 'what-if-you-had-known' questions as eliciting inadmissible expert opinion testimony from fact witnesses."  *Id.* at 457.

The Second Circuit found the testimony admissible as fact testimony, or, alternatively, lay opinion.  The Court ruled that, although having expertise as accountants, the two witnesses could testify about how their accounting would have changed if they had known truthful information.  *Id.* at 458.  Both accountants had performed their accounting functions in the normal course of events.  Neither were specially hired to evaluate the financial record and opine about what it showed.  The Court also commented that "since the applicable accounting rules were explained in detail, the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors."  *Id.*  And, the accountants' testimony was lay, not expert, opinion because the accounting rules and their interpretation were not at issue; rather, the only issue was whether the withheld facts would have altered the rules' application."  *Id.* at 460.

In one sense, Zarett's testimony is like the accountants' testimony in *Cuti*. Specifically, Zarett's opinion that the Barclays records discovered after the accounting was submitted to Surrogate's Court do not change her conclusions about the accounting is exactly like the testimony permitted in *Cuti*.  Zarett (with others at Gettry Marcus) prepared the Surrogate Court's accounting and has first-hand knowledge of it; her testimony that the Barclays records do not change her conclusion is admissible in that respect.  *See generally Atlanta Channel, Inc. v. Solomon*, No. 15-1823, 2021 WL 4243383, at *5 (D.D.C. Sept. 17, 2021) ("courts have routinely permitted experienced

professionals to offer lay opinion testimony about what would have happened had some disputed fact been different").

That said, Zarett is not like the accountants in *Cuti* who worked for the company that was the subject of the accounting on a regular basis in the normal course of business; Zarett and Gettry Marcus were hired specially to prepare the judicial accounting in the Surrogate's Proceeding.  In that respect, however, Zarett is akin to the forensic accountant in *United States v. Rigas*, another Second Circuit case.  There, the court upheld the admissibility of the testimony of a forensic accountant retained by the subject company's new management to examine the company's books and records and investigate transactions that had been entered into when the company was operated under previous management.  490 F.3d 208, 223-25 (2d Cir. 2007); *see also Bank of China, New York Branch v. NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (upholding admissibility of bank employee assigned to investigate defendants' activities at tail-end of scheme and after the bank had stopped doing business with defendants "so long as the testimony was based on the investigation and reflected [the employee's] investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking").  Analogously, Gettry Marcus served as forensic accountants to examine the Family Trust records and determine whether there were any unreconciled transactions.  Moreover, Gettry Marcus prepared the accountings for purposes of settling the Family Trusts in Surrogate's court, not for this litigation.  And, Ilaria has not suggested that the parties disagree on any accounting rules that would require expert testimony.

Considering the foregoing, and that Veronica timely disclosed that a Gettry Marcus employee was a witness on whom she may rely, the Court finds that the Zarett declaration

39

testimony may be considered by the Court as it sets forth a combination of facts and lay opinion.

### 3.   Kay

In some respect, the Kay declaration is on par with the Zarett declaration.   Just as Zarett opined that the judicial accountings her firm prepared revealed no missing assets and resolved all purported discrepancies, Kay "concludes," based on Kroll's own review of the records, "that errors, omissions, and inconsistencies" have not been fully explained and that certain transfers have not been reconciled, thus "rendering incorrect Ms. Zarett's conclusion that there is no evidence of missing assets." (Kay Decl. ¶¶ 44-45.)  To the extent Zarett's conclusions are lay, not expert, opinion, then essentially so are Kay's. Nonetheless, the Kay declaration is on different footing than the Zarett declaration.

First, allowing consideration of the Kay declaration would be inequitable given how adamantly Ilaria represented that she would not rely on the substance of Kroll's findings. To be sure, Ilaria represented that she would not rely on the substance of Kroll's analysis "to prove any element of her claims." (Dkt. 252 at 7.)  Perhaps that language was meant to exclude reliance on Kroll for rebuttal.  But Ilaria's additional representations were not similarly qualified.  Rather, in obtaining a discovery ruling in her favor denying Veronica disclosure of Kroll's analysis, Ilaria's counsel stated "the only relationship between Kroll's analysis and the claims in the case is that Plaintiff seeks to recover the fees she paid to Kroll as part of her damages" and that "Kroll is not a testifying expert." (*Id.* at 7, 9.)  Just as Veronica steered Ilaria away from Nicola as a witness on whom Ilaria would rely, Ilaria steered Veronica away from the notion that Ilaria would rely on Kroll's analysis.  Indeed, Ilaria secured judicial relief allowing her to withhold production of the Kroll analysis by

40

making those same representations to the Court. As a result, Veronica does not have access to the analysis underlying Kay's conclusions, while Ilaria has full access to Gettry Marcus' analysis: the accountings filed in Surrogate's Court. Allowing Ilaria to now rely on the Kroll analysis she so adamantly refused to produce would be highly prejudicial to Veronica.

Second, the Kay declaration addresses several subjects that the Zarett declaration does not. That additional subject matter cannot be accurately characterized as "rebuttal," even its broadest sense, to anything offered by Zarett. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii) (permitting expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party"); *United States v. Barrow*, 400 F.3d 109, 121 (2d Cir. (2005) ("rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary"); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (noting that a rebuttal's scope "is limited to the same subject matter encompassed in the opposing party's expert report," and that "district courts have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language").

Nor can it legitimately be defended as mere "summary" witness testimony. Rather, Kay opines about whether or not assorted documentary evidence proves when Veronica was appointed as a co-trustee (Kay Decl. ¶¶ 22-24); she offers Kroll's determination of the relative gain or loss of value of trust assets at different points in time based on review of account statements "and analysis of market returns," (*id.* ¶¶ 40-41); she provides her opinions about whether an increase in expenditures for the Millbrook properties was

41

"significant," (*id.* ¶ 37); and she opines about her findings whether and why certain entities were or were not in "good standing" in certain states (*id.* ¶¶ 38-39). Those substantive opinions, conclusions, and characterizations are materially different from the type of testimony that was found to be permissible "summary" testimony in the cases cited by Ilaria. *See Alto v. Sun Pharmaceutical Industries, Inc.*, No. 19-CV-9758, 2021 WL 4803582, at *13 (S.D.N.Y. Oct. 13, 2021) ("Critically … whether or not the results of the experiments or the conclusions drawn therefrom were accurate [wa]s not at issue" and, so, testimony was "simply reporting historical events"); *Lujan v. Cabana Management, Inc.*, 284 F.R.D. 50, 77-78 (E.D.N.Y. 2012) (declaration provided review and comparison of payroll records and explained the contents of and how certain exhibits were created); *Securities and Exchange Commission v. Treadway*, 430 F. Supp.2d 293, 322 (S.D.N.Y. 2006) (declaration of SEC employee "simply add[ed] up the number of round trips executed by Canary in PIMCO Funds investments" as distinguished from expert witnesses in the case who performed statistical and quantitative analysis to determine "whether the [trading] strategy was successful, whether Canary made gains or losses, and thus whether there was any harm or potential harm to shareholders from this trading").

To sum up, the Court will consider the declarations of Natalia and Zarett. The Court will disregard the declarations of Nicola and Kay. Notwithstanding that determination, based on the analysis below, the Court would reach the same result on summary judgment regardless of whether any, all, or none of those four declarations are taken into account. Thus, although the Court will disregard the Nicola and Kay declarations, they are occasionally referenced herein.

**Legal Standard On Summary Judgment**

To obtain summary judgment under Federal Rule of Civil Procedure 56, the movant must show that there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). The Court may grant summary judgment "only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Conversely, "[s]ummary judgment is improper if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Banks v. General Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (internal quotation marks omitted).

The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988)).

The opposing party must then come forward with specific evidence establishing the existence of a genuine dispute; conclusory statements or mere allegations are not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 248; *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008) (summary order). Where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary

43

judgment must be granted. *Celotex*, 477 U.S. at 322; *accord El-Nahal v. Yassky*, 835 F.3d 248, 252 (2d Cir. 2016); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (finding that, if there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper).

In assessing the record to determine whether there is a genuine issue of material fact, the Court must "eschew credibility assessments," *Smith v. Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) (internal quotation marks omitted), and resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson*, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

**Discussion**

Veronica moves for summary judgment against both Ilaria's claim for breach of fiduciary duty and her claim for negligence. Veronica argues that she fulfilled her fiduciary duties, that Ilaria suffered no injury as a result of anything Veronica did, and that she is entitled to judgment on Ilaria's negligence claim because there is no common law claim for negligence against a trustee. In opposition, Ilaria argues that there are disputed material facts on which a reasonable jury could find that Veronica breached her fiduciary duty in multiple respects, which caused Ilaria injury. In particular, according to Ilaria, Veronica (1) cannot account for at least $1.28 million of trust assets; (2) failed to properly maintain trust records and promptly furnish them to Ilaria when requested; (3) failed to investigate irregularities brought to her attention by Ilaria; (4) failed to properly record title to the Millbrook properties; and (5) placed her own interests above Ilaria's by attempting to coerce Ilaria into agreeing to the Newco Trust by squeezing her financially and lying to

44

her.    Ilaria claims that she was injured by having to spend money to investigate and examine the trusts to ensure the assets were properly protected. She also asserts that she was harmed by Veronica's delay in distributing assets from the Family Trusts. Lastly, Ilaria asserts that her negligence claim is not duplicative of her breach of fiduciary duty claim and therefore is viable.

Undisputed evidence demonstrates that Veronica fulfilled major aspects of her fiduciary duty and that she is entitled to summary judgment on several of Ilaria's claims. In particular, Veronica cannot be liable for missing assets, because she was not a co-trustee at the time those assets purportedly went missing; Veronica indisputably complied with her obligation to investigate alleged irregularities raised by Ilaria; Veronica had no duty with respect to the Filicaia Trust or Nicola's cutting off funds to all three sisters; and Ilaria suffered no damages from Veronica's failure to properly record title to the Cottage. The Court also agrees with Veronica that Ilaria's negligence claim should be dismissed. Genuine issues of disputed material fact, however, preclude summary judgment as to whether Veronica sufficiently and timely responded to Ilaria's requests for information, whether Veronica was disloyal to Ilaria by delaying distribution of assets, and whether and to what extent either of those caused damages to Ilaria.

## A.    Veronica Fulfilled Major Aspects Of Her Fiduciary Duties

To state a claim for breach of fiduciary duty under New York law, "a plaintiff must allege: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's conduct." *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (quoting *United States Fire Insurance Co. v. Raia*, 94 A.D.3d 749, 942 N.Y.S.2d 543, 545 (2012)). Damages are an "essential

45

element" of a breach of fiduciary duty claim, *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 140, 879 N.Y.S.2d 355, 360 (2009), and must be caused by the defendant's misconduct. *Besen v. Farhadian*, 195 A.D.3d 548, 549–50, 151 N.Y.S.3d 31, 34 (1st Dep't 2021) ("To state a claim for breach of fiduciary duty, plaintiffs must allege that ... they suffered damages caused by [the] misconduct") (internal quotation marks omitted) (quoting *Burry v. Madison Park Owner LLC*, 84 A.D.3d 699, 699-700, 924 N.Y.S.2d 77, 78 (1st Dep't 2011)). Veronica argues that she fulfilled her fiduciary duties and engaged in no misconduct. She focuses in particular on "evidence shows that the assets of the Family Trusts were prudently invested and managed, appreciated at well-above market rates, and have been distributed equally to the [trusts] for each sister." (Veronica Mem. at 11.) To a large extent, those facts are indisputable.

A trustee has a duty to "invest and manage" a trust's property "as a prudent investor would." Restatement (Third) of Trusts § 90 (2007); *see also* N.Y. Est. Powers & Trusts § 11-2.3 (McKinney) ("A trustee has a duty to invest and manage property held in a fiduciary capacity in accordance with the prudent investor standard"). A trustee may satisfy that duty by delegating the investment or management of a trust, so long as the trustee prudently selects a suitable delegee. N.Y. Est. Powers & Trusts § 11-2.3(c) (McKinney). Veronica did exactly that. Veronica delegated investment and management of Trust assets to Morgan Stanley, a sophisticated, reputable financial institution.[33] Given the substantial value and nature of the Trust assets, Veronica's delegation to Morgan Stanley was indisputably prudent. *See In re Arnold O.*, 279 A.D.2d 774, 777, 719 N.Y.S.2d

---

[33] Ilaria quibbles that Veronica did not merely rely on Morgan Stanley but also relied on advice of lawyers, including Haimo. (*See* Ilaria 56.1 Resp. ¶¶ 42, 46.) That fact is immaterial to whether Veronica prudently invested and managed the Trust assets.

174, 177 (3d Dep't 2001) ("Petitioner's decision to select a professional investment firm to assist him in the management of the significant trust assets is entirely prudent"); *In re Axe*, 132 Misc. 2d 137, 139, 502 N.Y.S.2d 943, 945 (N.Y. Surr. Ct. 1986) (emphasizing the "necessity for advice in the management of a large trust").  Ilaria does not contend otherwise.

Having delegated investment and management of Trust assets to Morgan Stanley, Veronica had the duty to exercise oversight of Morgan Stanley.  If a trustee "exercise[s] care, skill and caution" in selecting the delegee to invest and manage funds and setting the terms of the delegation, New York law requires only that the trustee "periodically review[ ]" the delegee's exercise of that function and control the overall cost by reason of the delegation.  N.Y. Est. Powers & Trusts § 11-2.3(c)(1)(C), (D) (McKinney).  Ilaria has not questioned the selection of Morgan Stanley or the scope of their charge.  Ilaria also has not raised any issue about Morgan Stanley's costs.  And, there is no evidence to contradict Veronica's testimony that she regularly met with investment advisors at Morgan Stanley to supervise investment of trust assets.  (Veronica Decl. ¶ 31.)

There also can be no genuine dispute that Veronica's delegation of investment and management of Trust assets to Morgan Stanley greatly benefitted the Family Trusts. The Family Trust assets grew from approximately $52 million in May 2015 (when Veronica was formally appointed co-trustee of Trust #1) to $90 million in October 2019 (when Anna died) to more than $129 million on November 16, 2020 (when Veronica made the first distribution from the Trusts).[34]  (*See* Ilaria 56.1 Resp. ¶¶ 40, 48, 81.)  In just five

---

[34] As discussed below, Ilaria disputes whether approximately $1.2 million of the Family Trust assets are accounted for, but she does not dispute that the trust assets grew to at least the values reflected in the Morgan Stanley statements from which the dollar amounts

years, the Trust assets more than doubled, adding more than $75 million in value. *See* Karlan Decl. Ex. CC (Family Trust performance chart). Ilaria does not contend that Veronica should have invested the assets any differently, let alone shown that different investment and management would have led to better performance.[35]

Veronica also generally fulfilled her obligation to evenly distribute the Trust funds to each sister. She paid out equal distributions at the same times to Ilaria, Natalia, and herself. (Ilaria 56.1 Resp. ¶¶ 82-85.) While Veronica maintained a reserve for taxes, legal expenses, and administration of the Family Trusts, that reserve was exhausted. (Veronica Decl. ¶¶ 64-65.) If any of the three sisters was enriched from distributed funds more than the others, it is Ilaria. She admits that whereas both Veronica and Natalia returned $1.5 million of the amounts distributed to them to replenish the reserve, she has refused to do so. (Ilaria 56.1 Resp. ¶¶ 89-90.)

Ilaria does, however, contend that Veronica diverted Trust assets in two ways that benefitted her at the expense of Ilaria. (*Id.* ¶ 86.) The first is having spent assets of the Family Trusts to pay for "living expenses" associated with the Millbrook properties that benefitted Veronica and her family alone. Ilaria does not identify or quantify what "living expenses" Veronica allegedly funded with assets from the Family Trusts.[36] To the extent

---

referenced above are derived.

[35] Ilaria does complain that during the time between the second and third distribution from Trust #1 the value of the investments declined and she therefore was injured by Veronica's failure to distribute the assets earlier. But Ilaria does not argue, let alone offer any proof, that the investments would have done better if invested differently.

[36] In or about 2012, funds were used to renovate the Cottage, thus contributing value to the Millbrook property that ultimately was distributed equally among the sisters, but those are different than "living expenses." (*See* Haimo Decl. ¶ 25; Zarett Decl. ¶ 21 and Exs. L-O.)

Ilaria's claim is based on Veronica's having allegedly prevented Ilaria from staying at the Millbrook residence while Veronica and her family did so, that claim is unsubstantiated. Ilaria has not identified anything that Veronica did or said that prevented Ilaria from staying at the Millbrook properties.  To the contrary, it was Ilaria's father Nicola who urged her not to go to Millbrook, saying "[s]omething along th[e] lines" of it being dangerous for Ilaria to stay in Millbrook during COVID. (Boies Decl. Ex. M at 224:14-225:9.)   And, while Ilaria claims she has "not accessed" any part of the Millbrook properties since October 18, 2020, she does not allege that she could not access the property if she wanted to or that she even tried to do so.  (Ilaria Decl. ¶ 67.)

Second, Ilaria faults Veronica for spending money from the Family Trusts on attorneys in furtherance of ongoing breaches of her fiduciary duties.  Ilaria does not elaborate on that accusation.  She does not specify which attorneys she has in mind or the particular services rendered.  Nor does she set forth any independent wrongful act of Veronica apart from the specific breaches she alleges as the basis for opposing summary judgment.  Those are: failure to account for at least $1.28 million of assets, failure to adequately maintain records and provide them to Ilaria as requested, failure to investigate irregularities raised by Ilaria, failure to record title to the Millbrook Property, and placing Veronica's interests above Ilaria's by trying to coerce Ilaria to agree to the Newco Trust and delaying distribution of assets from the Family Trusts.  The Court discusses each alleged breach in turn.

## B.    The Allegedly Missing Assets

A trustee has a duty to exercise prudence in managing and monitoring a trust's assets. *Tibble v. Edison International*, 575 U.S. 523, 529 (2015); Restatement (Third) of

49

Trusts § 90 (2007).  That includes taking care that assets are preserved.  *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 572 (1985) ("One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets"); *G. Bogert & G. Bogert*, Law of Trusts and Trustees ("Bogert") § 582 (trustee has duty "to do all acts necessary for the preservation of the trust *res* which would be performed by a reasonably prudent [person] employing [their] own like property for purposes similar to those of the trust").  As noted above, Veronica can only speculate what happened to the approximate $1.28 million ending balance at Lehman Brothers in 2005.  The balance "was either transferred to Morgan Stanley, faced market losses, or was used to purchase securities or pay taxes." (Veronica Mem. at 17.)  And although the Gettry Marcus accountants concluded for the Surrogate Court accounting that there are no missing assets – as Ms. Zarett reaffirms – it still is not clear exactly what happened to them.  (*Compare* Zarett Decl. ¶¶ 19-20 (accounting for two transfers that Ilaria claims cannot be accounted for) with *id.* ¶ 18 (stating with no further explanation that "[a]t the end of 2005, … the Lehman Brothers account had a balance of $1,280,593").  Ilaria claims that Veronica's inability to account for those funds is a breach of fiduciary duty.[37]

---

[37] The Kay declaration separately identifies two transfers of funds totaling approximately $1.2 million that allegedly cannot be "reconciled" but does not suggest that they are in addition to the $1.28 million on which Ilaria's opposition brief focuses; to the contrary, she suggests they are one and the same.  (Kay Decl. ¶¶ 29-35.)  Veronica's reply explains, with reference to specific account statements and entries, exactly how "most" of the two transfers identified by Kroll are in fact accounted for.  (Reply Mem. at 7.)  The Court need not resolve whether that explanation eliminates a genuine factual dispute about whether any funds actually went "missing."  The two transfers addressed by Kroll date from 2007 (Kay Decl. ¶ 30), during the period that Veronica was not yet a co-trustee and had no fiduciary duty to Ilaria.

Apart from the $1.28 million discussed above, Ilaria accuses Veronica of admitting and failing to follow up on a purported $3.15 million discrepancy as well as not personally knowing what happened to and not taking steps to investigate $9 million of Trust #1's

There is a fundamental flaw in Ilaria's argument. Veronica was not a co-trustee of the Family Trusts until May 2015, ten years after the closing balance in question, and seven years after the Lehman Brothers holdings were consolidated with Morgan Stanley. The Trust Agreement named Anna as the sole trustee. Veronica did not become co-trustee with Anna until May 2015 when both Anna and Veronica signed a Morgan Stanley Trust Certification and Trust Agreement. (Veronica Decl. Ex. C.) Veronica testified that she did not become co-trustee with Anna until May 2015. (Veronica Decl. ¶¶ 18, 21-24, Karlan Decl. Ex. A at 9:9.) Morgan Stanley's corporate representative testified that Veronica did not become co-trustee until May 2015. (Karlan Decl. Ex. C at 158:12-14.) Various account statements and other documents identify Anna as the only trustee prior to May 2015. (Karlan Reply Decl. Exs. CCC, DDD, EEE.)

Ilaria, however, has pointed to two documents pre-dating May 2015 that identify Veronica as a co-trustee. One is a Morgan Stanley "Trustee Certification of Investment Power" executed by Anna in 2005 providing Veronica with check-writing and withdrawal privileges. (Boies Decl. Ex. H.) Under "General Information About The Trust," Anna is identified as the only trustee of Trust #1. The certification is signed only by Anna as trustee. Veronica's name is written in at the section identifying authorized individuals who may provide instructions to Morgan Stanley, and her "relationship to the trust" is indicated

---

assets originally deposited with Lehman Brothers. (Veronica Resp. 56.1 ¶¶ 207-09.) Those snippets of testimony, which are couched in terms of what Veronica herself did, ignore the steps taken, at Veronica's direction, by others including attorneys, accountants, and Morgan Stanley to resolve those issues. (*See* Reply Karlan Decl. Ex. ZZ, AAA, BBB; Zarett Decl. ¶¶ 17-21.) Perhaps that is why in her opposition brief Ilaria's argument about missing assets discusses only the $1.28 million. (*See* Ilaria Mem. at 18-23.)

as "co-trustee." At his deposition, Morgan Stanley's corporate representative was shown and asked about the 2005 certification, acknowledged that Veronica is identified as a co-trustee in the authorized-individual section, and, with reference to the certification, initially referred to Veronica as being added as co-trustee in 2005. (Karlan Decl. Ex. C at 133:6-25, 142:3-10.) He clarified, however, that the 2005 certification merely made Veronica an authorized individual on the account, and that Veronica was not added as a co-trustee until 2015 as reflected in the 2015 trust certification (*id.* at 157:20-158:23), which lists both Anna and Veronica as trustees and is signed by both Anna and Veronica as trustees (Veronica Decl. Ex. C; *see also* Veronica Decl. ¶¶ 22-23 (Veronica stating that she had never seen the 2005 document prior to the instant litigation and she did not sign the document, while the 2015 certification reflects the start of her official relationship as co-trustee with Trust #1 as of May 28, 2015).

The second document appears to be an unauthenticated 2011 closing binder for the purchase of 34 Home Free Millbrook property that identifies both Anna and Veronica as trustees. (Boies Decl. Ex. I.) 2011, however, is several years after Lehman Brothers collapsed and its holdings were transferred to Morgan Stanley. Thus, even if Veronica had become a co-trustee as of 2011, she cannot be held liable for assets that supposedly went missing years earlier while Anna was sole trustee.

Moreover, neither document is signed by Veronica (Veronica Decl. ¶ 23; Boies Decl. Ex. I), nor manifests Veronica's acceptance to become trustee. As such, neither document is proof, at least without proof of Veronica's acceptance of which there is none, that Veronica was in fact a co-trustee prior to May 2015. *See Sankel v. Spector*, 33 A.D.3d 167, 173, 819 N.Y.S.2d 520 (1st Dep't 2006) ("the designee [for trustee] is not

qualified to act until he accepts the designation"); *In re Estate of Goldowitz*, 145 Misc. 300, 305, 259 N.Y.S. 900 (N.Y. Surr. Ct. 1932) ("It is fundamental that the mere naming of one as trustee does not constitute him such until he accepts the appointment"); *cf. Russo v. Pension Benefit Guarantee Corp.*, No. 86-CV-9741, 1991 WL 254570, at *6 (S.D.N.Y. Nov. 20, 1991) (finding defendant was trustee based on, inter alia, fact that she had signed several documents denoting her as trustee).

At most, the two documents may reflect Anna's belief that Veronica was a co-trustee. But Anna's belief is not enough. While Veronica accompanied Anna to meetings with Morgan Stanley and may well have provided advice to Anna related to Trust #1 from its inception, Veronica indisputably did not accept appointment as a co-trustee of Trust #1 prior to May 2015. (Veronica Decl. ¶¶ 18, 21-24.) Veronica thus had no fiduciary duty to Ilaria before then. All Lehman Brothers assets were disposed of or transferred to Morgan Stanley by 2008, well before Veronica became a fiduciary. Accordingly, she cannot be liable for assets, if any, that went "missing" at that earlier time.

In a footnote, Ilaria argues that even if Veronica did not become co-trustee until May 2015, "her fiduciary responsibilities included a duty to examine the assets in the Family Trusts at the time she became co-trustee and investigate any issues that pre-dated her trusteeship." (Ilaria Mem. at 21 n.4.) An argument raised only in a footnote may be disregarded. *Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review"); *F.T.C. v. Tax Club, Inc.*, 994 F. Supp.2d 461, 471 n.1 (S.D.N.Y. 2014) ("It is well settled … that a court need not consider arguments relegated to footnotes"). Regardless, Veronica's duty to investigate after becoming co-trustee is

53

distinct from any act or omission prior to her becoming co-trustee that resulted in missing assets. Even Ilaria separately deals with Veronica's alleged failure to investigate as an independent breach, which the Court discusses below.

In short, Veronica did not breach her fiduciary duty in failing to account for funds that allegedly went missing years before she became co-trustee. Veronica is entitled to summary judgment on Ilaria's "missing assets" claim.

## C.    Veronica's Maintenance And Provision Of Records

Ilaria accuses Veronica of failing to properly maintain trust records and to promptly furnish them to Ilaria when requested. A trustee has "a duty to maintain clear, complete, and accurate books and records regarding the trust property and the administration of the trust." (Restatement (Third) of Trusts § 83 (2007); *see also* Boies Decl. Ex. C § 9(A) (Trust #1 provision requiring trust to "keep a record of all transactions relating to the trust").) Since becoming a co-trustee, Veronica has done so by delegating record-keeping of all account information to Morgan Stanley. Ilaria does not dispute that Morgan Stanley maintained adequate records of the trust account assets and investments since May 2015.[38]

---

[38] Ilaria does question the extent to which Veronica received account records from Morgan Stanley, and the evidence is conflicting, at least with respect to how she did so. In particular, Veronica asserts as an undisputed fact that from the time she was formally named co-trustee in 2015, she "regularly reviewed Morgan Stanley's electronic Trust #1 account statements." (Ilaria 56.1 Resp. ¶ 45.) But in an April 26, 2020 email to Ilaria, Veronica wrote "I as Trustee do not receive emails from Morgan Stanley, do not consult them electronically and I immediately shred all hard copies." (Boies Decl. Ex S.) Regardless, Veronica regularly met with Morgan Stanley and relied on Morgan Stanley to maintain the account records.

But Veronica also had "a duty, promptly to respond to the request of any beneficiary for information concerning the trust and its administration, and to permit beneficiaries on a reasonable basis to inspect trust documents, records, and property holdings."    Restatement (Third) of Trusts § 82(2) (2007); *see also* Bogert § 962 ("Generally, if a beneficiary of a trust requests information about the trust from the trustee, the trustee must promptly furnish it").    Whether or not Veronica did so is a genuinely disputed issue of material fact.

There is evidence to show that Veronica refused or deflected Ilaria's request for trust-related information, particularly Morgan Stanley account statements.  In April 2020, Veronica informed Ilaria that Veronica would not provide Morgan Stanley account statements to Ilaria or anyone else, either electronically or on paper.  (Veronica 56.1 Resp. ¶ 181; Boies Decl. Ex. S.)  When Ilaria again requested account statements, Veronica responded in May 2020 that account statements would not be circulated any time before the Family Trusts were divided into three parts.  (Veronica 56.1 Resp. ¶ 183; Boies Decl. Ex. YY.)  Then, Ilaria's attorney, Freidman, made multiple requests of Veronica's attorney, Dumont, to provide account statements for a ten-month period. Dumont at first refused, and then proposed that the records would only be made available to Ilaria's lawyers, with restrictions and subject to a non-disclosure agreement.  (Veronica 56.1 Resp. ¶¶ 184, 187; Dumont Decl. ¶¶ 18-19.)  After Freidman refused those conditions, Dumont provided a summary instead of actual monthly statements.  (Veronica 56.1 Resp. ¶¶ 188-191; Dumont Decl. ¶ 21; Boies Ex. CCC, DDD.)  Indeed, it was not until at least spring 2021 that Veronica "fulfilled her obligations to her sister" and "provided

Ilaria with 185 monthly statements from Morgan Stanley reflecting the history of Trust #1's account through the life of the account." (Veronica Mem. at 15.)

To be sure, Veronica did not refuse Ilaria all information. As early as April 2020, Veronica noted to Ilaria that Ilaria could meet with the Morgan Stanley investment managers to obtain "all the details in conversation." (Veronica 56.1 Resp. ¶ 181; Boies Decl. Ex. S.) Veronica invited Ilaria to take notes but asked that she keep them safeguarded and not share them with anyone. (*Id.*) While Ilaria portrays Veronica as nefariously depriving her of complete information, Veronica consistently explained that her concern was privacy and adhering to Anna's practices. (*E.g.*, Boies Decl. Exs. S, YY, ZZ.) And the summary Morgan Stanley document that Dumont provided Freidman in July 2020 appears to be comprehensive for the time period requested by Ilaria. (*Id.* Ex. CCC, DDD.) But it still was not until at least spring of 2021, approximately a year after Ilaria first asked for account information, that Veronica had provided a full set of account statements.

In short, there are fact questions as to how Veronica responded to Ilaria's requests, what information she made available, in what form she made it available, and the timeline on which she made it available, were reasonable. Those are issues for the finder of fact that cannot be resolved on summary judgment.

## D.    Veronica's Investigation Of Irregularities

Ilaria asserts that as part of Veronica's duty to exercise reasonable diligence in monitoring trust investments, "Veronica had an obligation to investigate any irregularities brought to her attention." (Ilaria Mem. at 26.) She then charges Ilaria with violation of that duty on the basis that "Veronica and her representatives appear never to have

56

investigated, let alone resolved, several of the[ ] irregularities" that Ilaria brought to her attention.  (*Id.*)  Ilaria's statement of the law is broader than the authority she cites,[39] but Veronica does not argue that Veronica had no to investigate irregularities.   Rather, she argues that she fulfilled that obligation.   Veronica, with the help of Morgan Stanley and her attorneys, indisputably did so.  Whether all discrepancies have yet been resolved may be a factual dispute, but there can be no genuine question that Veronica fulfilled her obligation to investigate the concerns raised.

Ilaria first raised alleged irregularities with Veronica on April 27, 2021.  (Karlan Decl. Ex. GG.)  She did not, however, provide much specificity.  To the contrary, she referred generally to what her lawyers characterized as, for example, "thirty-one instances where the monthly opening account balance does not agree with the previous month's closing balance"; "twenty-one statements [that] include prior period adjustments … but not supported with any description or data in the body of the statement"; "multiple times" when the client account name and branch locations changed; and "certain deposits and withdrawals" that "lack sufficient description."  (*Id.* at 1-2.)  Veronica's lawyers responded two weeks later stating that they had "reviewed" Ilaria's April 27 letter but noted that it made "only general, non-specific references" to various purported findings.  (Boies Decl. Ex. GGG.)  Rather than simply ignoring the issues, Veronica requested a copy of the

---

[39] As support for the broad proposition that Veronica had an obligation to investigate "any irregularities" brought to her attention, Ilaria cites the following authority:  "Bogert § 612 (trustee has a duty to 'investigate further, using professional assistance, to determine the **propriety of the assets received**') (emphasis added); *Chao v. Hochuli*, 244 F. Supp.2d 93, 978-98 (E.D.N.Y. 2003) (trustee breached duty where he 'had knowledge' of prohibited transfers from ERISA plan and did not 'take any … action as **to ascertain the propriety of the transfers)** (emphasis added).")

forensic report that underlay Ilaria's assertions "[s]o that we can respond to your questions and concerns." (*Id.*)

Ilaria, however, did not provide the report or even follow up until November 5, 2021, more than six months later, when her new attorneys provided a spreadsheet based on the Kroll forensic examination "[t]o facilitate your review." (Karlan Decl. Ex. HH at 1.) The letter also provided additional information about alleged "irregularities in the account statements." (*Id.*) Ilaria thus has only herself to blame for Veronica's not investigating the unspecified purported irregularities at an earlier time. Ilaria, not Veronica, dropped the ball and did not follow up to provide Veronica with the information needed for her to investigate further. Veronica thus indisputably did not breach her duty to investigate during the intervening months up to November 5, 2021.

Thereafter, Veronica responded to Ilaria's letter in less than a week on November 11, 2021. Far from rebuffing Ilaria's letter, Veronica's letter indicated that her team already had conducted a "preliminary review" of certain issues raised by Ilaria and explained the reasons behind many of the purported discrepancies. (Boies Decl. Ex. HHH at 1-2.) While characterizing various of the alleged discrepancies (such as missing page numbers and variations in structure) as immaterial, Veronica's letter explained them as likely being due to Morgan Stanley's recordkeeping systems and committed to further reviewing them. (*Id.* at 2.) And there is no evidence contravening Veronica's evidence that her team followed up with Morgan Stanley on the issues raised. (*See* Karlan Decl. Ex. C at 111:9-114:13, 126:8-23, 127:18-128:4, 160:13-25.) Even Ilaria concedes that Veronica "instructed Morgan Stanley" to look into the issues raised by Ilaria and "relied

on her counsel and on Morgan Stanley's expertise to resolve the discrepancies." (Veronica 56.1 Resp. ¶ 205.)

Again, several months passed before Ilaria's lawyers sent another letter formally addressing purported irregularities.   In that March 21, 2022 letter, Ilaria's attorneys acknowledged that six previously identified issues "appear to have been resolved" while six others remained unresolved and two others "appear to have been partially resolved." (Karlan Ex. JJ at 2.)   Ilaria rejected Veronica's explanations for several issues that Veronica had characterized as immaterial, and identified several "newly identified issues." (*Id.* at 4-8.)   Just three days later, on March 24, 2022, Veronica's attorneys responded. (Boies Decl. Ex. LLL.)   The letter addressed each one of the previously identified but unresolved issues, indicating either that the attorneys had already made further inquiry with Morgan Stanley, or asking for more specific information that Ilaria still had not provided (such as identifying the 24 statements purportedly with discrepancies in opening and closing balances, and copies of statements containing inconsistent supplemental information).   (*Id.* at 2-3.)   As for the newly identified issues, the letter stated that Veronica's attorneys had already inquired with Morgan Stanley.   (*Id.* at 4.)   Again, the parties may disagree about whether particular alleged discrepancies have been resolved, but there can be no genuine dispute that Veronica fulfilled her duty to investigate them.

Ilaria also accuses Veronica of failing to make "any serious effort to retrieve records of the missing Lehman Brothers funds from Barclays, even after Ilaria raised the issue."  (Ilaria Mem. at 22.)  Again, there is undisputed evidence that Veronica, through Haimo, did make efforts to determine if there were any such records.  More specifically, Haimo got in touch with the former Chief Operations Officer of Barclays; the firm to which

59

Barclays had sold its wealth management business; and a Senior Vice President of Morgan Stanley who had been a former Director of Barclays. (Haimo Decl. ¶¶ 33-34, 37.) All of those were dead ends. Ilaria suggests that since she successfully obtained the Lehman Brothers records from Barclays while Veronica failed to do so, Veronica necessarily did not fulfill her duty. But Ilaria only obtained the records by serving a subpoena as part of the instant litigation.

At bottom, Ilaria merely speculates that "Veronica and her representatives *appear* never to have investigated." (Ilaria Mem. at 26) (emphasis added.) The undisputed evidence is to the contrary. Accordingly, Veronica is entitled to summary judgment on Ilaria's claim that Veronica breached her fiduciary duty to investigate alleged irregularities.

## E.   Failure To Properly Record Millbrook Property Title

There is authority for the proposition that when a trust obtains ownership of real property, "it becomes a duty on the part of the trustee to record the deed in the county record office, so that a later recorded conveyance to a second transferee … could not cut off the rights of the trustee." Bogert § 595. Ilaria contends that Veronica violated her duty by failing to properly record title to "the Millbrook Property." (Ilaria Mem. at 27.) The issue, which concerns only the Cottage, not the other two Millbrook properties (*see* Karlan Reply Decl. Exs. TT, UU), stems from the corporate transactions effected to bring all three Millbrook properties within the umbrella of 1935 Holding LLC so that the sisters could receive equal shares of the company and thus the properties. Specifically, although the Cottage was originally purchased by Verda N.V., Veronica did not record or cause to be recorded with the county clerk that either Verda U.S., the successor to Verda N.V., or 1935 Holding LLC, the successor Verda U.S., owned the Cottage. As a result, Ilaria

posits, Veronica "carelessly fail[ed] to ensure that title to millions of dollars in family real estate was property was properly perfected" and thus breached her fiduciary duty as trustee.  (Ilaria Mem. at 28.)  Veronica has not contested the legal proposition that her fiduciary duties extended to attending to proper recording of real property owned by the trust.  And, she has admitted that she did not record Verda U.S.'s or 1935 Holding LLC's ownership interest the Cottage with the county clerk. [40]  (Karlan Reply Decl. Ex. C at No. 29.)  Accordingly, she is not entitled to summary judgment at least with respect to that element.  As explained below, however, Veronica is entitled to summary judgment on the Cottage recording claim because there is no proof of any damages.

## F.    Whether Veronica Violated Her Duty Of Loyalty

"[A] fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect."  *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746 (1989); *see also Matter of Epstein*, 202 A.D.3d 669, 673, 163 N.Y.S.3d 149, 154 (2d Dep't 2022) (trustees have a duty of "complete unselfishness and inflexible loyalty to the interest of the beneficiaries of the trust").  Where, as here, a trustee is also a beneficiary of the trust, courts review the trustee's conduct "with strict scrutiny and special care" because a trustee-beneficiary has "an inherent conflict with other trust

---

[40] Veronica notes that New York law provides that upon merger "[a]ll the property, real and personal, … shall vest in such surviving or consolidated corporation without further act or deed."  (Veronica Mem. at 19 (citing N.Y. Bus. Corp. Law § 906(b)(2).).  Citing another section of the same law, Ilaria counters that "where the record owner of real estate changes via a merger transaction, the certificate of merger must be recorded in the county where the real estate is located.  (Ilaria Mem. at 28 n.7 (citing N.Y. Bus. Corp. Law § 907(g).)  The Court need not resolve the legal consequences of those statutory provisions because, as noted above and explained below, even if Veronica breached her duty to properly record the Cottage property, there are no associated damages to sustain Ilaria's claim.

beneficiaries." *Kleeberg v. Eber*, 665 F. Supp.3d 543, 569-70 (S.D.N.Y. Mar. 30, 2023); *see also* Bogert § 543 (a trustee "must administer the trust with complete loyalty to the interests of the beneficiary, without consideration of the personal interests of the trustee or the interests of third persons").

Ilaria asserts that Veronica placed her own interests above those of Ilaria by conspiring to coerce Ilaria into agreeing to the less-advantageous Newco Trust instead of the trust terms contemplated by the Family Trusts. Ilaria further alleges that Veronica retaliated against her for requesting information about the trusts by delaying distribution of trust assets and acting with her attorneys and Nicola to squeeze her financially so that she would agree to the Newco Trust. From Veronica's perspective, Veronica was indifferent to the successor trust's terms and was not aware that the Newco trust drafted for Ilaria was any different than that drafted for Veronica. Veronica merely urged Ilaria to make a decision of which trust structure she preferred and proceed with appointing a co-trustee and identifying an account to which funds could be distributed. According to Veronica, Ilaria was responsible for any delay.

There is evidence to support Ilaria's view of events. Veronica's lawyer, Dumont, worked with Gartner, Nicola's lawyer and adviser, to draft the Newco Trust documents. (Dumont Decl. ¶¶15-16; Veronica 56.1 Resp. ¶¶ 150-51.) The Newco Trust prepared for Ilaria contained terms that were more restrictive than those provided for by the Family Trusts' successor trusts and that were less favorable than the terms contained in the Newco Trust prepared for Veronica. (*See* Veronica 56.1 Resp. ¶¶ 168-79.) Ilaria's Newco Trust would have imposed Gartner as her co-trustee, effectively put Ilaria on an allowance, and provided that one-third of Ilaria's trust assets remaining after her death

would go to other family members that could include Veronica's children.  (Gartner Decl. ¶ 12; Veronica 56.1 Resp. ¶¶ 168-79.)

Veronica distances herself from the Newco Trust by emphasizing that she "did not draft, ask anyone to draft, or pay for anyone to draft" the Newco Trust documents, "nor did she care which trust structure Ilaria chose." (Veronica Mem. at 22; *see also* Vernoica Decl. ¶¶ 66-68; Gartner Decl. ¶ 16.)  Moreover, Veronica testified that she had no knowledge that the terms of the Newco Trust proposed to Ilaria were any different than those proposed to Veronica.  (Boies Decl. Ex N at 107:4-14; *see also* Ilaria 56.1 Resp. ¶ 61.)  That all may well be true.  But regardless, the Newco Trust terms were not faithful to those contemplated by the Family Trusts; Veronica's lawyer was involved in drafting the Newco Trust terms; Nicola and/or his attorney Gartner exercised outside influence over the matter while Veronica was trustee; and the Newco Trust drafted for Ilaria contained provisions favorable to Veronica that were not reciprocated by similar provisions in Veronica's Newco Trust.

Further, evidence shows that Veronica "pressed [Ilaria] on trust documents" (Veronica 56.1 Resp. ¶ 159; Boies Decl. Ex. FF); Veronica participated in drafting a letter for Nicola threatening Ilaria with consequences if she did not fall in line (Veronica 56.1 Resp. ¶ 223); and Veronica's attorney, Dumont, participated in the communications about having Nicola stop making payments for certain of Ilaria's expenses (Veronica 56.1 Resp. ¶ 236; Boies Decl. Ex. YYY.)  There also is conflicting evidence about the purpose behind the Newco Trust terms.  Was the purpose for tax reasons, as Ilaria claims she was told? (Ilaria Decl. ¶ 30.)  Was it to "protect" Ilaria, as Veronica argues?  (See Veronica Reply at 10 n.6; *see also* Gartner Decl. ¶ 13; Dumont Decl. ¶ 13.)  Or was it to preserve assets

within the family, even if not entirely for Ilaria's benefit?  (*See* Ilaria Decl. ¶ 36 (describing the Newco Trust drafted for her as limiting her ability to designate successor beneficiaries, "forcing me to leave at least one-third of any remaining funds upon my death to other relatives, including Veronica and her family").)

Ilaria also argues that Veronica was unfaithful to her duties by unduly delaying distribution of the Trust #1 assets.  Anna died on October 22, 2019.  Veronica did not make the first distribution of $20 million to each sister until over more than a year later on November 16, 2020; the second distribution of $15 million until December 28, 2020, and the third distribution of $5 million until June 15, 2022.  Veronica blames Ilaria for the delay in distributing assets, arguing that "Ilaria delayed in naming her co-trustee and opening her individual trust account." (Veronica Mem. at 21-22.)  That period, however, accounts only for the time between August 2020, when Ilaria rejected the Newco Trust, and November 2, 2020, by which time she had named a co-trustee (approved by both Veronica and Natalia) and identified a bank account.  Veronica's argument ignores the much longer time period between October 2019 and August 2020 consumed by the efforts to have Ilaria agree to the Newco Trust.  It also ignores the year-and-a-half period between the second and third distribution made by Veronica.

Ilaria attributes delay in distribution to ill motive, particularly the so-called conspiracy to pressure Ilaria financially so that she would agree to the Newco Trust. Some of the events to which Ilaria points as pressuring her financially are ones for which Veronica has no fiduciary responsibility to Ilaria.  Those include Nicola's cutting off regular payments to Ilaria, and Nicola's revocation of the Filicaia Trust.  Yet even though Veronica has no liability with respect to those actions and any financial hardship they imposed on

64

Ilaria, Veronica is still responsible for the timing of distributions from Trust #1. As Veronica acknowledges, "[a]ny delay in distribution is judged for reasonableness." (Veronica Mem. at 21 (citing *In re Estate of Najjar*, 171 N.Y.S.3d 807 (Table), at *13 (N.Y. Surr. Ct. 2022).) Whether timing of the distributions by Veronica was reasonable is a disputed material fact.

In short, there are genuine issues of material fact about whether Veronica violated her duty of loyalty to Ilaria. Whether any of that caused harm is a different question addressed next.

## G.   Damages

As explained above, there are disputed issues of material fact whether Veronica breach her fiduciary duties with respect to (1) stonewalling's Ilaria's requests for account records; (2) failing to properly record change in ownership of the Cottage with the county clerk; and (3) violating her duty of loyalty by pressing Ilaria to accept the Newco Trust and delaying distribution of trust funds. Ilaria acknowledges, however, that damages is a necessary element of her claim for breach of fiduciary duty. (Ilaria Mem. at 16 (citing *Johnson v. Nextel Communications, Inc.*, 660 F.3d 131, 138 (2d Cir. 2012).) Accordingly, Veronica may still be entitled to summary judgment if she can establish, beyond genuine dispute, that Ilaria suffered no damages as a result of those breaches.

Ilaria argues that Veronica's breaches caused her damages by compelling Ilaria to spend millions of dollars on accounting and legal fees to investigate and protect the Trusts' assets. (*Id*. at 33-34.) She also alludes to loss in value of assets "while Veronica was improperly holding onto them" (*id.* at 34), particularly between the second and third distributions. Ilaria does not, however, present any evidence of damages resulting from

failure to properly record change in ownership of the Cottage.  Nor can she.  It is undisputed that 1935 Holding LLC still holds the property (Veronica 56.1 Resp. ¶ 119), and Ilaria has not pointed to anything in the record to suggest that she has suffered any damages from improper recording.  As there is no evidence to establish that required element, Veronica is entitled to summary judgment with respect to that portion of Ilaria's breach of fiduciary claim based on failure to properly record ownership of the Cottage with the county clerk.  The Court cannot conclude the same, however, with respect to the other two surviving breach claims.

The primary damages alleged by Ilaria are professional fees she paid to attorneys and accountants to investigate and protect the Family Trusts' assets in response to Veronica's refusal to provide account statements and her breach of loyalty.  Ilaria argues that she was "forced" to hire professionals to investigate and forensically examine available information because Veronica both "refused to provide account statements in response to Ilaria's legitimate requests, and then failed to investigate irregularities identified by Ilaria."  (Ilaria Mem at 34.)  As discussed above, Veronica is entitled to summary judgment on the claim that she breached her duty to investigate irregularities raised by Ilaria.  For that reason alone, Ilaria cannot recover damages flowing from the alleged failure to investigate.  Rather, she can recover only those damages caused by Veronica's breach of her duty to respond to Ilaria's requests for records, assuming Ilaria were to succeed in proving such a breach.

Veronica contends, however, that Ilaria may not recover any professional fees because they are litigation costs that cannot be recovered absent a statute, contract, or rule allowing it.  (Veronica Reply at 12-13.)  The Court already rejected that argument

when Veronica moved to dismiss the complaint.  As Judge Schofield explained in denying the motion, Veronica's argument "mischaracterizes the relief specified in the Complaint. The costs that [Ilaria] seeks to recover were incurred to review Morgan Stanley account statements and tax filings from Trust #1, not in preparation for this litigation."  (Dkt. 249 at 20.)  At the very least, there are fact issues as to whether the costs that Ilaria claims are damages were incurred in part or in whole for non-litigation purposes.  Summary judgment thus cannot be granted on Ilaria's claims for damages based on expenditure of professional fees.[41]

Other than professional fees, Ilaria alludes to one other category of damages. Ilaria asserts that she was harmed by "delay[ed] distributions of Trust #1's assets (which decreased in value while Veronica was improperly holding onto them)."  (Ilaria Mem. at 34.)  In particular, Ilaria references the period of time between the second distribution in December 2020 and the third distribution of $5 million in June 2022.  (Ilaria Decl. ¶ 78.)

Veronica argues in reply that Ilaria incurred no harm from any delay in distributions because "in the period between Anna's death and the full distribution of the Family Trusts'

---

[41] At oral argument, Veronica raised for the first time the argument that while professional fees to investigate fiduciary misconduct may be recoverable in the context of testamentary trusts, they are not recoverable where, as here, the trusts are *inter vivos*. An argument not included in a party's briefs may be deemed waived and therefore disregarded. *See, e.g.*, *Ohr Somayach/Joseph Tanenbaum Educational Center v. Farleigh International Ltd.*, 483 F. Supp.3d 195, 206 n.6 (S.D.N.Y. 2020).  The Court nevertheless invited the parties to submit three-page letter briefs on the issue, which they did. (*See* Dkts. 407, 410.)  Having considered those submissions, the Court agrees with Ilaria that the cases Veronica cites as support for her newly-minted argument do not support the proposition advanced.  Both cases dealt with breach of fiduciary duty among partners and distinguished that context from cases involving testamentary trusts; the cases made no distinction between testamentary trusts and *inter vivo* trusts and identified no policy or rationale to warrant one.  *See Soley v. Wasserman*, 639 F. App'x 670, 677-78 (2d Cir. 2016); *Schneidman v. Tollman*, 261 A.D.2d 289, 290, 691 N.Y.S.2d 58, 59 (1st Dep't 1999).

assets, Trust #1's assets grew substantially, directly benefitting Ilaria." (Veronica Reply at 13.) It is indisputable that, overall, the Trust's assets grew substantially between Anna's death and the third distribution. But that is beside the point. Ilaria's claim is that between the second and third distribution her remaining share of trust assets declined in value such that she would have received more had those investments been liquidated and distributed at an earlier time. That is a cognizable monetary harm linked to the timing of the distribution. Veronica has not demonstrated beyond dispute that the time between the second and third distributions, if determined to be unreasonable, did not cause financial harm to Ilaria.[42] Accordingly, Veronica is not entitled to summary judgment on Ilaria's claim based on delayed distribution.[43]

In sum, two of Ilaria's breach of fiduciary duty claims survive summary judgment: failure to provide records as requested and breach of the duty of loyalty. Veronica is entitled to summary judgment on Ilaria's other breach claims, namely those relating to missing assets, recording of the Cottage, and the duty to investigate.

---

[42] Ilaria does not provide any analysis or factual support that Trust #1's assets declined in value between the second and third distributions. The Kay declaration does approximate the amount of decline (Kay Decl. ¶¶ 40-41), but that testimony is inadmissible for the reasons discussed above. That said, Veronica has not pointed to any evidence that the value of the trust assets between the second and third distributions did not decline. As such, Veronica has not met her burden to demonstrate by undisputed fact that Ilaria cannot recover any damages associated with the allegedly delayed distribution.

[43] Additionally, at oral argument, Ilaria asserted that any period of unreasonably delayed distribution caused her injury by depriving her of earlier access to that which she was entitled and that she thus is entitled to recover the statutory rate of pre-judgment interest for the period of delay. The parties did not brief the issue, and the Court does not resolve it at this time.

**H.    Ilaria's Duplicative Negligence Claim**

Veronica also seeks summary judgment on Ilaria's second cause of action for negligence.  Veronica is entitled to summary judgment on this claim because it is entirely duplicative of Ilaria's breach of fiduciary duty claim, and Ilaria identifies no duty of care owed by Veronica independent of her fiduciary duty as trustee.

Duplicative claims are subject to dismissal.  *See Norwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (affirming dismissal of claims of breach of fiduciary duty, breach of contract, and negligence as duplicative of claim for legal malpractice); *Blackrock Allocation Target Shares: Series S Portfolio v. Bank of New York Mellon*, 180 F. Supp.3d 246, 261 (S.D.N.Y. 2016) (dismissing causes of action for breach of fiduciary duty and negligence as duplicative of breach of contract claim).  "Two claims are duplicative of one another if they arise from the same facts and do not allege distinct damages."  *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (internal quotation marks and alterations omitted).

While fiduciary duty and negligence claims are not by definition duplicative and can independently proceed where they merely overlap to some extent, *de Kwiatkowski v. Bear Stearns & Co.*, 126 F. Supp.2d 672, 694-95 (S.D.N.Y. 2000), *rev'd on other grounds*, 306 F.2d 1293 (2d Cir. 2002), a negligence claim will not stand where there is no independent duty of care apart from the trustee's fiduciary duty.  *See NYAHSA Services, Inc. v. People Care Inc.*, 167 A.D.3d 1305, 1309, 91 N.Y.S.2d 528 (3d Dep't 2018) (dismissing negligence claim as duplicative where it and breach of fiduciary duty claim "both are founded upon allegations that the individual trustees owed certain duties to defendant and, through their alleged failure to properly operate, manage and oversee the

69

operations of the trust, they breached these duties"); *In re Mundo Latino Market Inc.*, 590 B.R. 610, 619 (S.D.N.Y. Bankr. 2018) (dismissing negligence claim as duplicative of breach of fiduciary duty claim because they relied on the same facts, "the same elements (duty of care, breach and damages)," and sought the same relief); *cf. Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 511 (2d Cir. 1994) (holding that only single recovery was allowed where plaintiff sought damages under two different theories – negligence and breach of fiduciary duty). Without an independent duty of care, there is no claim for negligence. *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (ordering dismissal and stating that "[t]he existence of a duty is thus a *sine qua non* of a negligence claim"); *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir.1997) (affirming dismissal of negligence claim and stating that "[i]n the absence of a duty, as a matter of law, no liability can ensue") (internal quotation marks omitted).

Ilaria's negligence claim does not just overlap with her breach of fiduciary claim; it is fully encompassed by it. The negligence claim seeks the same relief as the breach of fiduciary duty claim and is based on the same facts as the breach of fiduciary duty claim. That is evident from Ilaria's Complaint. Her negligence claim is the second of two claims, but there is a single demand for relief. (Compl. at ECF 25.) The negligence claim expressly incorporates by reference all previous allegations in the Complaint rather than setting out any different or independent facts. (*Id*. ¶ 97.) Ilaria nonetheless argues that "to the extent a jury might ultimately agree that Veronica did not formally become co-trustee and therefore did not assume fiduciary duties until May 2015, her conduct pre-dating May 2015 would engender liability for negligence." (Ilaria Mem. at 35.) But Ilaria

70

identifies no source for any duty of care that Veronica would have owed to Ilaria absent Veronica's role as trustee.

To the contrary, the allegations of negligence are fully encompassed by Ilaria's breach of fiduciary claim, the only difference of note being that the negligence allegations use the term "duty of care" rather than "fiduciary duty." (*Compare* Compl. ¶¶ 88, 91-96 *with id.* ¶¶ 97-104.) The duty of care on which Ilaria's negligence claim turns is no different than Veronica's fiduciary duty. Ilaria's negligence claim concedes as much, alleging that Veronica, "**as Trustee of Trust #1**, owed a duty of care to Trust #1 and to Ilaria, as a beneficiary of Trust #1." (Compl. ¶ 98 (emphasis added).) And, Ilaria has not identified anything from the summary judgment record that gives rise to a duty of care independent of her claim for breach of fiduciary duty. Accordingly, Veronica is entitled to summary judgment on Ilaria's negligence claim.

## Conclusion

To the extent not discussed herein, the Court has considered all of the parties' arguments and determined them to be either moot or without merit.

The parties' motions to strike are denied; however, the Court finds that the declarations of Nicola and Kay should be disregarded for purposes of the instant motion.

For the reasons stated above, Defendant's Motion For Summary Judgment should be GRANTED in part and DENIED in part. Specifically, summary judgment should be granted in Veronica's favor on (1) Ilaria's claims that Veronica breached her fiduciary duty with respect to missing assets, maintaining records, investigating irregularities, and failing to record change in ownership of the Cottage with the county clerk, and (2) Ilaria's claim for negligence. Summary judgment should be denied to Veronica on Ilaria's claims for

71

breach of fiduciary duty with respect to whether Veronica sufficiently and timely responded to Ilaria's requests for trust-related information, whether Veronica was disloyal to Ilaria by delaying distribution of assets, and whether and to what extent either of those breaches caused damages to Ilaria.

### Deadline For Filing Objections And Preserving Appeal

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Any party shall have fourteen (14) days to file a written response to the other party's objections. Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Lorna G. Schofield, United States Courthouse, 40 Foley Square, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Any request for an extension of time for filing objections must be addressed to Judge Schofield. **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 22, 2024
       New York, New York

Copies transmitted to all counsel of record.